(94 FO 299) STATE of Wisconsin, Plaintiff-Appellant,

v.

Dennis J. KING, Defendant-Respondent.

(94 FO 300) STATE of Wisconsin, Plaintiff-Appellant,

v.

Ronald E. KING, Defendant-Respondent.

(94 FO 297, 95 FO 232) STATE of Wisconsin, Plaintiff-Appellant,

v.

Simon W. DECOTEAU, Defendant-Respondent.

(95 FO 234) STATE of Wisconsin, Plaintiff-Appellant,

v.

Ronald W. HILL, Defendant-Respondent.

(95 FO 236) STATE of Wisconsin, Plaintiff-Appellant,

v.

Earl J. JORDAN, Defendant-Respondent.

Court of Appeals

*No. 96–2735. Submitted on briefs June 10, 1997.—Decided July 29, 1997.*

(Also reported in 571 N.W.2d 680.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *James E. Doyle,* attorney general, and *Steven E. Tinker,* assistant attorney general.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Patricia Hawpetoss Brzezinski* of Oneida, and *Milton Rosenberg* of Madison.

Before Cane, P.J., LaRocque and Mohr,[1] JJ.

LaROCQUE, J. The State appeals an order dismissing its prosecution of Dennis J. King, Ronald E. King, Simon W. DeCoteau, Ronald W. Hill and Earl J. Jordan (collectively, the respondents) for fishing within 500 feet of a dam in contravention of WIS. ADM. CODE §§ NR 20.09(2)(c) and 20.07(2)(a). The State asserts that the trial court erred when it found that the

---

[1] Circuit Judge James B. Mohr is sitting by special assignment pursuant to the Judicial Exchange Program.

---

respondents, members of the Oneida tribe, were fishing within reservation borders. The State also requests this court to vacate portions of the trial court's judgment, which it claims would be potentially prejudicial in future litigation. We modify the judgment and affirm.

In 1994 and 1995, the respondents were fishing with dip nets in Duck Creek near Pamperin Park Dam in Brown County. The State cited the respondents for fishing within 500 feet of a dam in contravention of WIS. ADM. CODE §§ NR 20.09(2)(c) and 20.07(2)(a). The respondents moved for dismissal of the charges, claiming that the court lacked subject matter jurisdiction over members of the Oneida tribe who were fishing within reservation borders.

The basis of the motion was that the reservation border at that point is the thread of Duck Creek and that therefore the State had no jurisdiction over fishing activities on the creek.[2] The respondents pointed to an 1831 treaty between the United States and several tribes that described the border of the reservation as "down said Duck creek."[3] A subsequent treaty, signed

---

[2] The Supremacy Clause of the United States Constitution provides that a treaty with the Indians is the supreme law of the land, U.S. CONST. art. VI, cl. 2, and "the exercise of rights on reservation lands guaranteed to the tribe by the Federal Government would not be subject to State regulation, at least in absence of a cession by Congress." *Menominee Tribe v. United States*, 391 U.S. 404, 411 n.12 (1968).

[3] The 1831 treaty describes the borders of the reservation as follows:

> beginning on the west side of Fox river, near the "Little Kackalin," at a point known as the "Old Mill Dam;" thence northwest forty miles; thence northeast to the Oconto creek, falling into Green bay; thence down said Oconto creek to Green bay; thence up and along Green bay and Fox river to the place of beginning; excluding there-

by the parties in 1838, ceded back to the United States all land described by the 1831 treaty but reserved portions of that land for a reservation.[4] The treaty did not describe which portions of the original reservation were so reserved, but rather left that issue to be determined by a subsequent survey.

That survey, performed by John Suydam in 1838, was designed to effectuate the intent of the 1838 treaty. A map of this survey was introduced along with Suydam's survey notes. The respondents argue that the map unambiguously establishes the thread of Duck Creek as the reservation boundary. Suydam's survey notes, they argue, are ambiguous regarding the intended boundary.

> from all private land claims confirmed, and also the following reservation for military purposes; beginning on the Fox river, at the mouth of the first creek above Fort Howard; thence north sixty-four degrees west to Duck creek; thence down said Duck creek to its mouth; thence up and along Green bay and Fox river to the place of beginning.

We note that the language "down said Duck creek" actually refers to the description of the military reserve, not of the Oneida reservation. However, the trial court notes that the State concedes that "[t]his geographic description includes the portion of Duck Creek in dispute," presumably because it describes a common boundary.

[4] The 1838 treaty stated:

> Art. 1.  The First Christian and Orchard parties of Indians cede to the United States all their title and interest in the land set apart for them in the 1st article of the treaty with the Menominies of February 8th, 1831, and the 2d article of the treaty with the same tribe of October 27th, 1832.

> Art. 2.  From the foregoing cession there shall be reserved to the said Indians to be held as other Indian lands are held a tract of land containing one hundred (100) acres, for each individual, and the lines of which shall be so run as to include all their settlements and improvements in the vicinity of Green Bay.

The State presented evidence that the boundary of the reservation is the west bank of Duck Creek, therefore not including its waters. It presented the testimony of certified land surveyor William Rohde and Brown County surveyor Leslie Van Horn, who claim that Suydam's 1838 survey notes allow an experienced surveyor to "retrace" Suydam's survey and that they unambiguously establish the west bank of Duck Creek as the reservation boundary. It also notes that subsequent surveys have placed the boundary of the reservation at the west bank of Duck Creek for over 150 years.

The trial court, issuing detailed findings of fact and conclusions of law, granted the respondents' motion to dismiss. In its findings, the court found that the text of the 1831 treaty established that the reservation included the waters of Duck Creek. It also found that the 1838 map unambiguously depicted that the border of the area reserved to the Indians ran down the thread of the creek. The court found the map particularly persuasive, finding that it was this map that the United States presented to the tribe to assist them in approving the 1838 treaty. The court noted the United States Supreme Court's oft-stated principle that treaties between the United States government and Indian tribes should be interpreted according to the understanding of the Indians at the time. *See Jones v. Meehan*, 175 U.S. 1, 10–11 (1899); *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 630–31 (1970). The court discounted the value of Suydam's survey notes, noting that State witness Rohde "waffled" when he first concluded that the notes did not conclusively establish a reservation boundary but later testified that the notes unambiguously establish the west bank as the reservation boundary. The State now appeals.

The parties first dispute our standard of review. Interpretation of treaty language is a question of law we review de novo. *See Bank of Barron v. Gieseke*, 169 Wis. 2d 437, 454–55, 485 N.W.2d 426, 432 (Ct. App. 1992) (interpretation of contractual language presents a question of law we review de novo). In addition, when interpreting purely documentary evidence, we need not defer to the trial court's findings. *State ex rel. Sieloff v. Golz*, 80 Wis. 2d 225, 241, 258 N.W.2d 700, 705 (1977) (When reviewing documentary evidence, the court "need not afford a trial court's findings any special deference.").

However, the respondents note that the trial court was faced with expert testimony regarding the inferences to be drawn from the documentary evidence. In this situation, we apply the "clearly erroneous" standard to the trial court's findings of fact. Section 805.17(2), STATS. We review the trial court's legal conclusions de novo. *First Nat'l Leasing Corp. v. City of Madison*, 81 Wis. 2d 205, 208, 260 N.W.2d 251, 253 (1977).

"[T]he basic rule for interpreting Indian treaties is to determine what was the intent of the parties." *State v. Gurnoe*, 53 Wis. 2d 390, 403, 192 N.W.2d 892, 898 (1972). In order to help discern the parties' intent, treaties are to be construed liberally with ambiguities being resolved in favor of the Indians. *Id.*; *State v. Sanapaw*, 21 Wis. 2d 377, 382, 124 N.W.2d 41, 44 (1963). Our first step in interpreting the treaty in this case is to turn to the language of the treaty itself. The treaty of 1831 describes the border of the reservation in the disputed area to run "down said Duck creek." The

504

United States Supreme Court has held that where a treaty describes a boundary as running "down" a river, it should be interpreted to mean the thread of the river. *Choctaw Nation*, 397 U.S. at 631. The 1838 treaty, which ceded portions of the original reservation back to the United States, did not describe the area reserved for the reservation. Thus, our attention shifts to the parties' intent regarding the reservation boundaries.

It is a basic rule of treaty interpretation that a court should look "beyond [the treaty's] written words to the negotiations and diplomatic correspondence of the contracting parties relating to the subject-matter, and to their own practical construction of it." *Gurnoe*, 53 Wis. 2d at 401, 192 N.W.2d at 897 (quoting *Factor v. Laubenheimer*, 290 U.S. 276, 295 (1933)). Thus, it is necessary for us to examine the parties' intent as evidenced by their negotiations and correspondence regarding the 1838 treaty. In addition, a court examining a treaty between the United States government and an Indian tribe must interpret the treaty as the Indians would have understood its terms. *Choctaw Nation*, 397 U.S. at 630–31.

The trial court was presented with evidence of the 1838 Suydam survey, which the parties agree was designed to effectuate the parties' intent regarding the reservation boundaries. The State contends that the trial court's analysis was "legally incomplete and erroneous" because it failed to find that the 1838 Suydam survey notes unambiguously established the west bank of Duck Creek as the reservation boundary. The gist of the State's argument is that the trial court should have relied solely upon the notes to determine the reservation boundary because those notes allow a competent surveyor to retrace the survey and establish the west

bank as the boundary. It cites *Anderson v. Huebel*, 133 Wis. 542, 545, 113 N.W. 975, 976 (1907), and *Lind v. Hustad*, 147 Wis. 56, 59–60, 132 N.W. 753, 755 (1911), for the proposition that when a surveyor's notes enable a competent surveyor to locate a disputed line, that line is conclusively established. Both Rohde and Van Horn testified that they could establish the boundary at the west bank by retracing Suydam's notes.

The record is not entirely clear that the survey notes unambiguously establish the west bank of Duck Creek as the reservation boundary, as the State argues. Rohde's analysis of Suydam's survey notes stated that those notes had no "entry which expressly defined either bank of the creek as the reservation boundary." Rohde's analysis also stated that the map and notes "are considered too general, incomplete or inconsistent to determine the intended easterly boundary of the reservation along Duck Creek between the intersecting northern boundaries of the reservation . . . ." Given this testimony, the trial court was not required to accept Rohde's ultimate conclusion that the notes unambiguously establish the west bank as the reservation boundary.[5]

---

[5] The State argues that Rohde, in his analysis, "did not mean that the west bank could not be determined to be the boundary, [but] rather the exact location along the west bank had not been laid out by Suydam." We disagree with this interpretation of Rohde's testimony. Rohde's analysis explicitly states that the notes lack any entry that "expressly defined either bank . . . as the reservation boundary" and that the notes are inadequate "to determine the intended easterly boundary of the reservation . . . ." These statements cannot be interpreted to mean that the notes explicitly establish the west bank as the reservation boundary. We agree with the trial court that Rohde "waffled" on the issue of the Suydam notes.

In addition to the survey notes, the court was presented with the 1838 Suydam map. The respondents argue, and the trial court found, that this map explicitly depicts the thread of Duck Creek as the reservation boundary. Indeed, Rohde conceded that the "normal conclusion" of a layman reading the Suydam map would be that the reservation terminated at the thread of Duck Creek. In fact, Rohde conceded that there was no way a person looking at the map could conclude otherwise. Given this testimony, we cannot say that the trial court's finding that the Suydam map explicitly depicted "Duck Creek itself, rather than the west bank, as the reservation boundary" is clearly erroneous.

Furthermore, the respondents argue, and the trial court found, that the 1838 Suydam map was presented to the Oneida tribe for their approval when negotiating the treaty. The court also found that it was to this map that the Oneidas expressed their satisfaction with the treaty terms.[6] These findings are not clearly erroneous. A court examining a treaty between the United States government and an Indian tribe must interpret the treaty as the Indians would have understood its terms. *Choctaw Nation*, 397 U.S. at 630–31. Because this map is evidence of how the Oneidas would have understood the terms of the 1838 treaty, the trial court could properly rely on it when it found that the parties

---

[6] The State argues that the Oneidas were also presented with Suydam's survey notes for their approval. The trial court found, however, that "[t]he completed survey of their reservation was presented to the Oneidas in the form of the [Suydam] Map, *not field notes*, and it is in reference to the map that the Oneidas expressed their 'complete satisfaction.' " (Emphasis added.) We conclude that upon the record before this court, this finding of fact is not clearly erroneous.

intended the reservation boundary to be the thread of Duck Creek.

The State next argues that the trial court's ruling is contrary to several government surveys performed over the course of over 150 years. Because the trial court could properly find that the parties intended the thread of Duck Creek to be the reservation boundary, as evidenced in part by Suydam's 1838 survey, we need not consider any later surveys. However, because the trial court made findings of fact regarding subsequent surveys we will briefly address those findings.

The reservation was next surveyed in 1875 by Henry Espersen for the purpose of subdividing the reservation into forty-acre lots.[7] Espersen ran a meander line down the west bank of Duck Creek. However, the respondents argue, and the trial court found, that this meander line was not to mark the reservation boundary, but rather was for the purpose of running interior lines for the forty-acre lots. The court also found that Espersen would have run this meander line down the west bank regardless of whether the reservation terminated in the thread of the creek or on its west bank. Thus, the trial court found that Espersen's meander line not probative regarding the location of the reservation boundary.[8] These findings are not clearly erroneous.

---

[7] The State asserts that two surveys of a nearby military reserve, one performed by Suydam in 1863 and 1864, are consistent with their assertion that the reservation terminates at the west bank of Duck Creek. Because it is not necessary for us to address this argument and because the trial court made no findings with regard to these surveys, we decline to address their significance.

[8] The State argues that Espersen was required to locate the reservation boundary to complete his survey and that he placed

The State argues that the trial court failed to consider several surveys subsequent to Espersen's. The respondents argue that these surveys merely retraced Espersen's survey and are also therefore not probative regarding the reservation boundary. This court may assume that a missing finding on an issue "was determined in favor of or in support of the judgment." *Sohns v. Jensen*, 11 Wis. 2d 449, 453, 105 N.W.2d 818, 820 (1960). We conclude that the trial court impliedly found that all surveys subsequent to Espersen's merely retraced his lines and are therefore not probative regarding the reservation boundary. This finding is not clearly erroneous.[9]

We conclude that the trial court could properly rely solely upon the 1838 Suydam survey to determine the

---

the boundary at the west bank. It points to Espersen's notes, which state that he ran a meander line "down left bank of Duck Creek which is here reserve boundary." The trial court found that this statement is ambiguous because it could mean, as the State argues, that the left, or west, bank is the reserve boundary or could mean, as the respondents would have it, that the creek was the reserve boundary. We agree that the statement is ambiguous.

[9] The record provides ample evidence to support this finding. An "Examination of Surveys" performed by surveyor N. B. Sweitzer in 1899 indicates that he retraced Espersen's meander line "on the left bank of Duck Creek set by Espersen in 1875." Then-Brown County Surveyor August Brauns indicated in notes made in 1905 and 1906 that he placed an iron bolt on the west bank of Duck Creek, designed to mark the reservation boundary, because that was the point where he found Espersen and Sweitzer's mark to be. Current Brown County surveyor Van Horn testified that he considered the west bank to be the reservation boundary after examining "prior surveys and historical documents."

reservation boundaries. The subsequent surveys are not instructive regarding the parties' intent. Furthermore, once the Suydam survey established the parties' intent regarding the boundaries, any subsequent surveys that diminish the reservation would be void absent an act of Congress. As stated by the Court:

> The first and governing principle is that only Congress can divest a reservation of its land and diminish its boundaries. Once a block of land is set aside for an Indian reservation . . . the entire block retains its reservation status until Congress explicitly indicates otherwise.

*Solem v. Bartlett*, 465 U.S. 463, 470 (1984).

Finally, the State challenges the following of the trial court's conclusions of law:

> 6.   As the Oneidas' right of access to Duck Creek on the west bank at Pamperin Park is a "treaty-recognized" title or right under the 1831 Menominee Treaty, it is the burden of the party claiming divestiture or relinquishment, to show by explicit evidence that "compels the conclusion" that extinguishment of the Oneidas' treaty-recognized right of access has occurred. *Lac Court[e] Oreilles Ban[d] v. State of Wisconsin*, ("*LCO I*"), 700 F.2d 341, 352–54, 64–65 (7th Cir. 1983); *Menominee Tribe v. United States*, 391 U.S. 404 (1968).

> 7.   The State has failed to produce any explicit evidence such as would meet the burden required to show that there has been an extinguishment of the Oneidas' right of access to Duck Creek at the Pamperin Park site.

The State claims that these conclusions unfairly establish "off-reservation" fishing rights for the Oneida tribe. The State asserts that the issue of off-reservation

rights is not properly at issue in this case and that the State, based on assurances from the respondents that they were not asserting off-reservation rights, failed to adequately argue the issue before the trial court. The State asks this court to vacate these conclusions in the interest of justice or, in the alternative, because the trial court abused its discretion in reaching the issue.

The respondents assert that these conclusions of law merely relate to the burden of proof applicable to this case. They argue that because their right to fish in Duck Creek is recognized by treaty, the State must prove by "explicit evidence" that "compels the conclusion" that the right is extinguished. *See Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 352–54, 64–65 (7th Cir. 1983); *Menominee Tribe*, 391 U.S. at 412–13.

We construe conclusions of law numbered 6 and 7 to relate only to the burden of proof applicable to the instant controversy. We agree with both parties that the record in this case is completely silent as to "off-reservation" rights. We further agree that the respondents at no time asserted rights in Duck Creek if the trial court was to find that the reservation did not include the creek.

Nevertheless, these provisions could be misconstrued by future litigants to establish usufructuary rights in the land described in the 1831 treaty but *not* included in the land reserved in the 1838 treaty. Because we construe these provisions merely to relate to the burden of proof applicable to the instant controversy, we agree that they may be vacated without affecting the result reached by the trial court. We therefore modify the judgment by vacating those conclusions of law in the interest of justice.

In doing so, we stress that we offer no opinion whether tribal members have any usufructuary rights in land outside the boundaries of the reservation. That issue was not raised before the trial court at any point during this litigation.

*By the Court.*—Judgment modified and, as modified, affirmed.