STATE of Wisconsin, Plaintiff-Respondent,

v.

Jose Carlos NAVARRO, Defendant-Appellant.†

Court of Appeals

*No. 02–0850–CR. Submitted on briefs January 9, 2003.— Decided February 19, 2003.*

2003 WI App 50

(Also reported in 659 N.W.2d 487.)

† Petition to review denied 4-22-03.

861

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Michael S. Holzman* of *Rosen and Holzman Ltd.* of Waukesha.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Maura FJ Whelan*, assistant attorney general.

Before Nettesheim, P.J., Brown and Snyder, JJ.

¶ 1. BROWN, J. This case presents an issue of first impression in Wisconsin. Jose Carlos Navarro contends that Article 36 of the Vienna Convention bestows a judicially enforceable individual right upon foreign nationals who have been detained by police to consult with the consular officials of their country. He argues that because the police failed to notify him of this right at the time he was arrested, the police violated his right to consular notification and his potentially incriminating post-arrest statements should have been suppressed. We conclude that the Vienna Convention does not create a private right that a foreign national can enforce in a state criminal proceeding and therefore Navarro has no standing to assert any remedy

pursuant to the Vienna Convention. We therefore affirm the judgment of conviction and sentence entered.

¶ 2. The facts of this case are undisputed. In March 2001, Navarro was arrested after a drug-related undercover police investigation. At the police station, Navarro was booked and interrogated after acknowledging and waiving his *Miranda*[1] rights. At the booking, the police learned that Navarro was born in Mexico and confiscated his wallet, which contained his resident alien card. During the interrogation, Navarro made a potentially incriminating statement to the police. At no time did the police advise Navarro that he had the right to contact the Mexican consulate for assistance. Navarro was later charged with various felony drug offenses.

¶ 3. In June, Navarro's attorney spoke with an employee of the Legal Affairs and Human Rights Office of the Mexican Consulate in Chicago. The employee informed Navarro's attorney that if he had been given the opportunity to speak to Navarro, he would have advised him not to make or sign any statements whatsoever until the assistance of legal counsel had been obtained.

¶ 4. Navarro then moved to suppress the statement he had made to the police on the grounds that the police had violated Navarro's right to consular assistance pursuant to Article 36 of the Vienna Convention. In its response to the motion to suppress, the State countered that the Vienna Convention created no individual rights and that, in any event, suppression was not the appropriate remedy for a violation of the treaty.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

¶ 5. Prior to the hearing on the motion to suppress, in an evidentiary deposition, Professor Douglass Cassel, an expert on international law and Mexican consular operations and procedures, testified that any statement made by Navarro without first notifying the Mexican consulate violated the Vienna Convention and should not be admitted into evidence. Then, at the hearing, the State stipulated that Article 36 of the Vienna Convention required the police to notify Navarro of his right to consular notification and that although the officers were aware that Navarro was a foreign national at the time of his booking, they did not notify him of his right. The State further stipulated that Navarro would have availed himself of consular assistance as guaranteed by the treaty had he known about it.

¶ 6. The trial court ultimately determined that suppression was not the appropriate remedy for a violation of the Vienna Convention's right of consular notification and denied Navarro's motion to suppress. Navarro subsequently pled guilty to one felony drug count. Navarro appeals the judgment of conviction and sentence entered.

¶ 7. In reviewing a trial court's ruling on a motion to suppress, the trial court's findings of fact will be upheld unless they are clearly erroneous. *State v. Eckert*, 203 Wis. 2d 497, 518, 553 N.W.2d 539 (Ct. App. 1996). However, the interpretation of a treaty is a question of law, which we review de novo. *State v. King*, 212 Wis. 2d 498, 504, 571 N.W.2d 680 (Ct. App. 1997).

¶ 8. The threshold question we must address is whether an individual foreign national has standing to assert a violation of Article 36 of the Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77,

T.I.A.S. No. 6820 (hereinafter "Vienna Convention"), in a domestic criminal case. The Vienna Convention is a seventy-nine article multilateral treaty signed by more than 100 nations, including the United States and Mexico. *State v. Martinez-Rodriguez*, 33 P.3d 267, 271 (N.M. 2001), *cert. denied, Martinez-Rodriguez v. New Mexico*, 535 U.S. 937 (U.S. Mar. 18, 2002) (No. 01–7656). It was drafted in 1963 and ratified by the United States in 1969. *Id.* The treaty governs the rights and functions of consular officers and also the privileges and immunities associated with their positions. *Id.* Navarro asserts that the treaty unambiguously confers judicially enforceable rights on criminal defendants who are foreign nationals. His argument originates in the language appearing throughout Article 36, which protects the ability of the consular officials of a sending state[2] to communicate with a detained national in a receiving state. Article 36 is entitled "Communication and contact with nationals of the sending State" and provides:

1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:

(a) consular officers shall be free to communicate with nationals of the sending State and to have access to them. Nationals of the sending State shall have the same freedom with respect to communication with and access to consular officers of the sending State;

(b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular

---

[2] The sending state is the nation of the arrested individual. *State v. Martinez-Rodriguez*, 33 P.3d 267, 271 n.2 (N.M 2001), *cert. denied, Martinez-Rodriguez v. New Mexico*, 535 U.S. 937 (U.S. Mar. 18, 2002) (No. 01–7656). The receiving state is the arresting nation. *Id.*

district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph;

(c) consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation. They shall also have the right to visit any national of the sending State who is in prison, custody or detention in their district in pursuance of a judgment. Nevertheless, consular officers shall refrain from taking action on behalf of a national who is in prison, custody or detention if he expressly opposes such action.

2. The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended.

Vienna Convention, 21 U.S.T. 77, at Art. 36.

¶ 9. In general, when confronted in recent years with numerous claims based upon Article 36 of the Vienna Convention, federal courts, without the benefit of a definitive statement from the United States Supreme Court, have sidestepped the question of whether the treaty creates individual rights whenever possible —typically by concluding that remedies such as suppression of evidence or dismissal of an indictment are not available. *See United States v. Emuegbunam*, 268 F.3d 377, 391 (6th Cir. 2001), *cert. denied, Emuegbunam*

*v. United States*, 535 U.S. 977 (U.S. Apr. 1, 2002) (No. 01–8531); *see, e.g., United States v. Lombera-Camorlinga*, 206 F.3d 882, 885 (9th Cir. 2000); *United States v. Li*, 206 F.3d 56, 66 (1st Cir. 2000). As Navarro points out, some federal courts, and at least one commentator, who have considered the issue, have impliedly or explicitly held that the Vienna Convention does confer an individual enforceable right that vests an injured party with standing to seek redress. *See, e.g., United States v. Torres-Del Muro*, 58 F. Supp. 2d 931, 933 (C.D. Ill. 1999); *Standt v. City of New York*, 153 F. Supp. 2d 417, 427 (S.D.N.Y. 2001); *United States v. Hongla-Yamche*, 55 F. Supp. 2d 74, 77–78 (D. Mass. 1999). *See also* Mark J. Kadish, *Article 36 of the Vienna Convention on Consular Relations: A Search for the Right to Consul*, 18 Mich. J. Int'l L. 565, 602 (1997). However, the court of appeals for the fifth and sixth circuits and one state supreme court have held that the Vienna Convention does not establish any judicially enforceable right of consultation between a detained foreign national and the consular representatives of his or her nation. *United States v. Jimenez-Nava*, 243 F.3d 192, 198 (5th Cir. 2001); *Martinez-Rodriguez*, 33 P.3d at 274; *Emuegbunam*, 268 F.3d at 394. While we acknowledge this split in opinion, in light of the well-established principles of international law that guide judicial construction of a treaty, we are convinced that the Vienna Convention does not confer standing on an individual foreign national to assert a violation of the treaty in a domestic criminal case.

¶ 10. Upon ratification, a treaty becomes the law of the land and on equal footing with federal statutes. U.S. Const. art. VI, § 2. As a general rule, however, international treaties do not create personal rights that

868

an individual may enforce in the courts of its signatory nations. *Emuegbunam*, 268 F.3d at 389; RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 907 cmt. a (1987) ("International agreements, even those directly benefiting private persons, generally do not create private rights or provide for a private cause of action in domestic courts . . . ."). In fact, courts apply a presumption that the rights created by an international treaty belong to a state and that a private individual cannot enforce them. *Emuegbunam*, 268 F.3d at 389. As the United States Supreme Court explained over one hundred years ago:

> A treaty is primarily a compact between independent nations. It depends for the enforcement of its provisions on the interest and honor of the governments which are parties to it. If these fail, its infraction becomes the subject of international negotiations and reclamations, so far as the injured parties choose to seek redress, which may in the end be enforced by actual war. It is obvious that with all this the judicial courts have nothing to do and can give no redress.

*Edye v. Robertson ("Head Money Cases")*, 112 U.S. 580, 598 (1884). Generally, for courts to find that a treaty provides a private right of action, the document must explicitly provide for such a right. *Martinez-Rodriguez*, 33 P.3d at 272. Thus, if a treaty is ambiguous, the presumption against implying private rights into the treaty comes into play. *Jimenez-Nava*, 243 F.3d at 197.

¶ 11. Applying these general principles, the Vienna Convention appears to be a customary international treaty whose purpose is to facilitate the establishment of consular relations between the sending and receiving states and define the functions of the consulate. Nowhere in the text of the treaty can we find a

869

statement or even a suggestion that the signatory nations intended to provide for a private right of enforcement of the provisions in the courts of the receiving states in criminal cases. The Preamble unambiguously renounces the creation of any individual rights:

> Believing that an international convention on consular relations, privileges and immunities would also contribute to the development of friendly relations among nations, irrespective of their differing constitutional and social systems, [and] [r]ealizing that the purpose of such privileges and immunities is *not to benefit individuals* but to ensure the efficient performance of functions by consular posts on behalf of their respective States.

Vienna Convention, 21 U.S.T. 77, at Preamble (emphasis added). Similarly, Article 36, which is the cornerstone of Navarro's argument, concerns the privileges and immunities of consular officers, not detained foreign nationals. *See Emuegbunam*, 268 F.3d at 392. The introductory sentence to Article 36 clearly states the purpose of the section is to encourage consular activity and the requirement that the receiving state notify arrested foreign nationals that they may confer with their nation's consulate merely advances this expressed purpose. *See* Vienna Convention, 21 U.S.T. 77, at Art. 36(1). Manifestly, the notification requirement informs the sending state that it has a foreign national in custody of a foreign government so that the consulate can then provide assistance to the national and ensure that he or she is afforded the same protections and courtesies as the citizens of the receiving state. However, a determination that the treaty confers benefits upon arrested foreign nationals is clearly not equivalent, as Navarro appears to allege, to a determination

870

that Article 36 was intended to vest the foreign national with standing to seek redress for treaty violations in domestic criminal cases. *Martinez-Rodriguez*, 33 P.3d at 273. Further, while Article 36 does speak in terms of "rights," this also does not translate, as Navarro would have us believe, to a conclusion that the language was intended to create a private right of action for criminal defendants. As was observed in the concurrence in *Li*:

> Of course, there are references in the [treaty] to a "right" of [consular] access, but these references are easily explainable. The contracting States are granting each other rights, and telling future detainees that they have a "right" to communicate with their consul is a means of implementing the treaty obligations *as between States*. Any other way of phrasing the promise as to what will be said to detainees would be both artificial and awkward.

*Li*, 206 F.3d at 66 (Selya & Boudin, JJ., concurring).

¶ 12. The treaty then is not ambiguous as to whether it creates a private right. Regardless, even if the language in the Preamble and Article 36 does admit of an ambiguity, the presumption against implying private rights comes into play and militates against our construing the treaty in a manner that would permit Navarro to enforce its provisions in a state criminal proceeding.

¶ 13. Further, we cannot ignore the fact that the treaty is dealing with sensitive matters of international relations, not domestic criminal law. When foreign affairs are involved, the national interest must be expressed through a single authoritative voice. *Martinez-Rodriguez*, 33 P.3d at 273 (citing *Li*, 206 F.3d at 67 (Selya & Boudin, JJ., concurring)). While courts

interpret treaties for themselves, the meaning given them by the government department particularly charged with their negotiation and enforcement is given great weight. *Id.* at 273–74.

¶ 14. With regard to the Vienna Convention, the State Department has consistently taken the position that although implementation of the treaty may benefit foreign nationals, it does not create judicially enforceable individual rights that can be remedied in the criminal justice systems of the member states. *Id.* at 274. According to the State Department, "[t]he [only] remedies for failures of consular notification under the [Vienna Convention] are diplomatic, political or exist between states under international law." *Id.*

¶ 15. The State Department's position appears to be in accord with customary practices, as the parties to the convention have attempted to ensure enforcement and remedy violations of Article 36 through diplomatic channels. The State Department has indicated that it has historically enforced the Vienna Convention itself, investigating reports of violations and apologizing to foreign governments and working with domestic law enforcement to prevent future violations when necessary. *Emuegbunam*, 268 F.3d at 392–93. In turn, "[m]any, if not most, of the countries with which the United States raises concerns that consular notification obligations have been violated with respect to U.S. citizens will undertake to investigate the alleged violation and, if it is confirmed, to apologize for it and undertake to prevent future recurrences." *Id.* at 393. Apparently, no country remedies violations of the Vienna Convention through its criminal justice system. *Id.* These practices evidence a belief among Vienna Convention signatory nations that the treaty can be

enforced, violations remedied, and future infractions prevented without invading the province of a sovereign nation's criminal courts.

¶ 16. Navarro and his expert, Cassel, rely primarily on the *LaGrand Case* (Germany v. United States of America), 2001 I.C.J. 104 (June 27), to support their argument that Navarro may enforce the Vienna Convention in a domestic criminal case. They contend that in *LaGrand*, the International Court of Justice (ICJ) required judicial intervention and a judicial remedy where the Convention is violated in serious criminal cases.

¶ 17. In *LaGrand*, the German government had gone before the ICJ claiming that the United States had violated the consular rights of the German government itself and of the LaGrands, two German nationals who were not informed of their consular rights until many years after their arrest for murder in Arizona. *Id.* at ¶¶ 10, 14, 75. The ICJ took jurisdiction in the case based on "Article I of the Optional Protocol concerning the Compulsory Settlement of Disputes, which accompanies the Vienna Convention," which reflects the signatory nations' agreement that the ICJ would be the primary forum for the settlement of disputes arising under the Vienna Convention. *Id.* at ¶ 1; *see also Martinez-Rodriguez*, 33 P.3d at 273. Based on the Optional Protocol, the ICJ concluded "Article 36, paragraph 1, creates individual rights, which . . . *may be invoked in [the ICJ] by the national State* of the detained person." *LaGrand*, 2001 I.C.J. 104 at ¶ 77. However, the ICJ went no further than that. Contrary to Navarro's assertion, the ICJ did not hold that Article 36 of the Vienna Convention creates legally enforceable individual rights that a defendant may assert in a domestic criminal proceeding to reverse a conviction.

¶ 18. Navarro also seems to assert that in *Breard v. Greene*, 523 U.S. 371 (1998), the United States Supreme Court held that individuals have enforceable rights under the Vienna Convention. While the Court did acknowledge that the Vienna Convention "arguably confers on an individual the right to consular assistance following arrest," it ultimately concluded that the defendant's claim under the Vienna Convention had been procedurally defaulted and thus the Court left the question of standing unresolved. *Id.* at 375–76; *see also Martinez-Rodriguez*, 33 P.3d at 274. Further, in the same case, the Court indicated that the Vienna Convention does not provide a signatory nation a private right of action in the federal courts to seek a remedy for a violation of the consular notification provisions. *Breard*, 523 U.S. at 377. With the Supreme Court having expressed doubt that a foreign sovereignty to whose benefit the Vienna Convention inures would have a private right of action in domestic courts, it seems highly unlikely that an individual foreign national could pursue an action. *Martinez-Rodriguez*, 33 P.3d at 274; *Emuegbunam*, 268 F.3d at 394.

¶ 19. In the absence of explicit language in the treaty granting individual foreign nationals a right of enforcement and a definitive directive from the United States Supreme Court, we can see no reason to depart from the well-established general principles of international law, the expressed position of the State Department, and the apparent long-standing practices of the international community to find that Navarro has a private right of action he can enforce in a state criminal proceeding. Further, such a conclusion would risk our interfering in the nation's foreign affairs and it is beyond question that "[i]ncalculable mischief can be

wrought by gratuitously introducing into this often delicate process court enforcement at the instigation of private parties." *See Li*, 206 F.3d at 68 (Selya & Boudin, JJ., concurring).

■

¶ 20. We therefore construe the Vienna Convention to confer no substantive rights in a state court proceeding. The Vienna Convention simply represents a notice accommodation to a foreign national, which does not extend into dictating substantive procedures or dispositions in a state proceeding. Accordingly, we hold that Navarro does not have standing to enforce the provisions of the Vienna Convention and the trial court properly denied his motion to suppress.

*By the Court.*—Judgment affirmed.