**Carlos Amaya GOMEZ, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2003–CA–000947–MR.

Court of Appeals of Kentucky.

Aug. 13, 2004.

Case Ordered Published by Court of Appeals Oct. 1, 2004.

John Rampulla, Fayette County Legal Aid, Inc., Lexington, KY, for appellant.

Albert B. Chandler III, Attorney General of Kentucky, Michael L. Harned, Assistant Attorney General, Frankfort, KY, for appellee.

Before JOHNSON, MINTON, and TACKETT, Judges.

## OPINION

MINTON, Judge.

Carlos Amaya Gomez appeals his conviction in the Fayette Circuit Court for first-degree wanton endangerment[1] under a conditional guilty plea for which he received a one-year sentence. Gomez's conditional plea reserved the right to appeal the circuit court's denial of his motion to suppress the incriminating statements because his limited comprehension of English prevented his making an intelligent waiver of his *Miranda*[2] rights and because the police failed to notify him of his rights to consult with Mexican consular officials under the Vienna Convention on Consular Relations.[3] The circuit court found that *Miranda* warnings do not apply to the pre-arrest questioning of Gomez; that, even so, Gomez had a sufficient grasp of English to understand the *Miranda* warnings; and that the failure to inform Gomez of potential consular rights does not result in suppression of evidence. We agree with the circuit court and affirm.

Gomez was originally indicted on two counts of first-degree wanton endangerment arising out of a shooting incident in Lexington on May 16, 2002, in which the occupants of a vehicle reported that the passenger of a white, four-door Plymouth Neon had fired a gun through the windshield of their vehicle. Gomez filed pretrial motions to suppress incriminating statements that he had made to the investigating officers. The circuit court conducted an evidentiary hearing at which Lexington–Metro Detectives Robert Sarrantonio and Albert Johnson testified about the events that led to Gomez's being arrested and charged. Gomez testified, too, but he related a very different version of the facts.

Sarrantonio and Johnson testified to the following. On the day of the shooting,

---

1. Kentucky Revised Statutes (KRS) 508.060.

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. Gomez contends that the right of consular officials from the nation of the arrested individual to communicate with their detained citizen is declared by Article 36 of the Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820. The Vienna Convention is a seventy-nine article multilateral treaty signed by more than 100 nations, including the U.S. and Mexico. *See State v. Martinez–Rodriguez*, 131 N.M. 47, 33 P.3d 267, 271 (2001), *cert den. Martinez–Rodriguez v. New Mexico*, 535 U.S. 937, 122 S.Ct. 1317, 152 L.Ed.2d 225 (2002).

Sarrantonio learned from the owner of the Neon that he had allowed Gomez and his brother, Eric, to use it the prior evening. The car owner led the detectives to Gomez's apartment. Sarrantonio, Johnson, and a uniformed officer knocked at Gomez's door and announced themselves. They were invited in. Gomez; his brother, Eric; Javier Tobar; and another male were present. Since a weapon had been involved, the officers immediately conducted a safety sweep of the apartment and ascertained that there were no other occupants.

All of the occupants of the apartment were Hispanic. Sarrantonio asked Gomez if he understood English. Gomez responded that he understood English well but that he had difficulty speaking English. Sarrantonio then Mirandized Gomez and Eric. Sarrantonio then asked Gomez if he understood. Gomez answered that he understood and nodded affirmatively.

Sarrantonio then explained to Gomez and the others why they had come. He informed Gomez and Eric that they had been identified as the likely suspects in the shooting incident and asked where the gun was. Gomez adamantly denied his involvement in the shooting, denied having a gun, and refused Sarrantonio's request for permission to search the apartment for the gun. Gomez told Sarrantonio that he would need a search warrant to look for the gun.

Johnson testified that while Detective Sarrantonio was talking, Gomez made a side comment in Spanish to Tobar, who was also fluent in English. Johnson, who understands Spanish, heard Gomez tell Tobar "I only shot once." Johnson confirmed his understanding by asking Tobar to repeat in English what Gomez had said. Tobar responded that Gomez had said he only shot once but that the other persons had shot three times. Johnson advised

Sarrantonio what Gomez had said. Sarrantonio then asked Gomez directly: "Did you shoot at them once?" Gomez responded that he did. Sarrantonio then asked Gomez to describe the events of the shooting. Gomez then informed the detectives that Eric had been the driver and he the passenger. He admitted that he shot the vehicle because the occupants had first shot at him three times.

The detectives testified that following these admissions, they arrested Gomez on two counts of wanton endangerment. As Gomez was being placed in the cruiser, Johnson testified that Gomez apologized, in English, for having lied about the shooting when first questioned. After he was placed in the cruiser, Gomez answered other questions in English, giving his name, address, birth date, marital status, and phone number to Sarrantonio. Both detectives reiterated in questioning by counsel and the trial court that all of the conversations they had with Gomez, and he with them, were in English.

Gomez testified in Spanish through a translator at the suppression hearing. He told the circuit court that he only understood a few English words when the detectives questioned him before his arrest. He emphatically denied speaking English at any time to the detectives. He testified that he did not understand that he had the right to remain silent.

 Following the hearing, the circuit court made the following findings of fact and conclusions of law:

At the suppression hearing, [Gomez] gave every impression of being unable to speak *any* English. In fact, it cannot be doubted that his English is far from fluent. But a large question exists as to whether the officers are uniformly lying about his English-speaking level or whether [Gomez] is. The Court finds

the officers' testimony credible even though it is probably impossible to establish the full extent of [Gomez's] knowledge of English without his cooperation.

It is notable that neither the Commonwealth nor defense offered testimony on this issue from others at the scene. Certainly, once the Commonwealth established its version of facts on the suppression issue, it behooves [Gomez] to refute them if they weigh adequately against him as they do here.

[Gomez] knew he was in the presence of officers. Believing himself shielded by the language barrier, he spoke freely to his friends. In so doing, he made a public statement subject to interpretation by anyone who heard it. No *Miranda* rights attach to this behavior. This response was not made due to interrogation techniques, but voluntarily to another person. If the police happened to overhear and understand it, that is [Gomez's] misfortune.

This Court is not unaware of the grave problems relating to language issues in criminal defense cases. If [Gomez] truly understands no English, and the officers are all lying, this entire case would be a terrible result. But there is no credibility in that scenario. It is [Gomez] who has the greater reason to feign incomprehension.

Nonetheless, in this case, [Gomez] knew he was in the presence of several officers, and that if he admitted wrongdoing, this would be used against him. Common sense would indicate this, *Miranda* notwithstanding. Yet experience has shown this court that it is frequently irresistible to a Defendant to try to explain what happened in a light most favorable to him or her. The Court believes this is what happened here.

Consequently, [Gomez's] Motion to Suppress is DENIED. The Court has previously ruled orally that the failure to advise [Gomez] of his consular rights is not fatal to this action since the most a consular official could do is visit or talk with [Gomez], and arrange for legal representation. [Gomez] has excellent legal representation, and the Court finds that all valid legal rights are being protected. [Gomez] is now aware of his consular rights and could pursue them at any time. The issues complained of here occurred prior to arrest and detention, and no rights provided by the Vienna Convention apply to pre-arrest statements specifically.

It is well settled that the standard of appellate review of a trial court's decision on a motion to suppress

> [r]equires that we first determine whether the trial court's findings of fact are supported by substantial evidence. If they are, then they are conclusive. Based on those findings of fact, we must then conduct a *de novo* review of the trial court's application of the law to those facts to determine whether its decision is correct as a matter of law.[4]

In the instant case, the trial court had substantial evidence before it and its findings are, therefore, conclusive that the facts are as the detectives described them to be. The trial court correctly concluded from these facts that a *Miranda* warning was not actually required because Gomez's statements were not the result of a custodial interrogation.[5] A defendant is in custody under *Miranda* when there is a formal arrest or restraint on freedom of movement of the degree

---

**4.** *Commonwealth v. Neal*, Ky.App., 84 S.W.3d 920, 923 (2002).

**5.** *Little v. Commonwealth*, Ky.App., 991 S.W.2d 141 (1999).

associated with a formal arrest.[6] We agree with the trial court that *Miranda* rights are not implicated under these facts because the incriminating comment Gomez made to Tobar in Spanish, though audible and understood by Johnson, was voluntarily made to a third party. Furthermore, we believe that the trial court correctly concluded that even if *Miranda* warnings, as given, were required, Gomez was able to understand his rights and he made a knowing waiver of them.

It is undisputed that Gomez was not advised about consultation with the Mexican consulate before being questioned. The record does not disclose when, if ever, the investigating officers were aware that Gomez was a citizen of Mexico. Indeed, the record of the suppression hearing discloses no evidence of Gomez's status, other than his own testimony that he was born in Mexico and that he has lived in the United States since 1999 or 2000. Nevertheless, citing Article 36 of the Vienna Convention, Gomez argues that any statement he made to the Lexington police should be suppressed because the police failed to notify him of his right to consular notification at the time of arrest. Gomez's incriminating statements, of course, occurred prior to arrest.

█ In general, when confronted in recent years with numerous claims based upon the Vienna Convention without the benefit of a definitive statement from the U.S. Supreme Court, federal courts have typically concluded remedies such as suppression of evidence or dismissal of an indictment are not available, even if the treaty creates individual rights. The U.S.

Court of Appeals for the Sixth Circuit in *U.S. v. Emuegbunam*[7] has gone further to hold that the Vienna Convention does not establish any judicially enforceable individual right of consultation between a detained foreign national and the consular representatives of his or her nation. We are similarly persuaded by the analysis and adopt the holding of the Court of Appeals of Wisconsin in *State v. Navarro*[8]:

> While we acknowledge this split in opinion, in light of the well-established principles of international law that guide judicial construction of a treaty, we are convinced that the Vienna Convention does not confer standing on an individual foreign national to assert a violation of the treaty in a domestic criminal case.

Accordingly, the circuit court properly denied suppression on this issue.

For the foregoing reasons, the judgment of the Fayette Circuit Court is affirmed.

ALL CONCUR.

---

6. *California v. Beheler,* 463 U.S. 1121, 1124, 103 S.Ct. 3517, 3519, 77 L.Ed.2d 1275 (1983).

7. 268 F.3d 377, 391 (6th Cir.2001). *See also United States v. Jimenez–Nava,* 243 F.3d 192,

198 (5th Cir.2001), and *Martinez-Rodriguez, supra* n. 3 at 274.

8. 260 Wis.2d 861, 659 N.W.2d 487, 491 (2003).