Argued and submitted November 4, 2004, decision of Court of Appeals and
judgment of circuit court affirmed March 10, 2005

## STATE OF OREGON,
*Respondent on Review,*

*v.*

## MOISES SANCHEZ-LLAMAS,
*Petitioner on Review.*

## (CC 996212FE; CA A114418; SC S51289)

108 P3d 573

Susan Fair Drake, Senior Deputy Public Defender, Salem, argued the cause and filed the brief for petitioner on review. With her on the brief were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Office of Public Defense Services.

Mary H. Williams, Solicitor General, Salem, argued the cause and filed the brief for respondent on review. With her on the brief was Hardy Myers, Attorney General.

GILLETTE, J.

## GILLETTE, J.

■ In this criminal case, defendant contends that the trial court committed reversible error by refusing to suppress his post-arrest statements to the police. The Court of Appeals affirmed without opinion the judgment of the trial court. *State v. Sanchez-Llamas*, 191 Or App 399, 84 P3d 1133 (2004). We allowed defendant's petition for review to consider his contention that the police violated his right to consular notification and communication, as guaranteed by Article 36 of the Vienna Convention on Consular Relations (VCCR),[1] and that suppression of his post-arrest statements is the necessary and appropriate remedy for that violation.[2] As we explain below, we conclude that Article 36 of the VCCR does not create rights that individual foreign nationals may assert in a criminal proceeding. Accordingly, we affirm the judgment of the trial court and the decision of the Court of Appeals.

Defendant is a Mexican national. He was arrested in December 1999 after an incident in which he exchanged gunfire with police officers and wounded one officer in the leg. Shortly after defendant's arrest, the police read him *Miranda* warnings in English and Spanish. The police did not inform defendant at that time, or at any time thereafter, that he had any "right" under Article 36 of the VCCR to communicate with the Mexican consulate and to have the consulate informed of his arrest. Neither did the police inform the Mexican consulate of defendant's arrest.

---

[1] As we explain more fully later in this opinion, the VCCR is a multilateral treaty that purports to define the functions of a consulate and govern the establishment of consular relations between the signatory nations. *See United States v. Emuegbunam*, 268 F3d 377, 388 (6th Cir 2001), *cert den*, 535 US 977 (2002) (describing treaty). As we explain elsewhere, defendant is a Mexican national. The United States and Mexico both are signatories. Generally, Article 36 of the VCCR requires "competent authorities" to inform the relevant consulate when a foreign national is arrested and to allow the consulate to communicate with the detained foreign national and vice-versa. Article 36 also requires authorities to advise detained foreign nationals "without delay" of those "rights."

[2] Defendant asserts an alternate theory for suppression, *viz.*, that the circumstances surrounding his arrest and detention show that his post-arrest statements, including his purported waiver of his *Miranda* rights, were not made voluntarily. However, we elect to limit our review to the issue that defendant raises under the VCCR. *See* ORAP 9.20(2)(court's opinion on review need not address all questions raised by petition).

The police proceeded to interrogate defendant, who eventually made a number of incriminating statements. Later, defendant was charged with attempted murder, attempted aggravated murder, and various other crimes. Before his trial on those charges, defendant moved to suppress his post-arrest statements to the police on the ground, *inter alia*, that the police had failed to inform him of his "rights" under the VCCR to consular access and notification. The trial court denied the motion, ruling, with respect to defendant's argument under the VCCR, that "any violation of the Vienna Convention that may have occurred * * * [did] not require suppression of defendant's statements." Defendant subsequently was convicted of 11 felony counts and sentenced to a total of 246 months in prison. As noted, the Court of Appeals affirmed the convictions and sentences on defendant's direct appeal.

Before this court, defendant continues to assert that his post-arrest statements should have been suppressed in order to vindicate his rights under Article 36 of the VCCR. The state responds that that claim fails for at least two reasons: (1) Article 36 of the VCCR does not confer individual rights that a detained foreign national may assert in a criminal proceeding; and (2) even if Article 36 did confer such rights, suppression of post-arrest statements to the police would not be the appropriate or required remedy for their violation. We focus, in this opinion, on the first argument.

We begin with the VCCR itself—a multilateral treaty that the United Nations adopted in 1963 and that the United States Senate ratified in 1969. Among its 79 articles is Article 36, which provides, in part:

"(1)   With a view to facilitating the exercise of consular functions relating to nationals of the sending State:

"(a)   consular officers shall be free to communicate with nationals of the sending State and to have access to them. Nationals of the sending State shall have the same freedom with respect to communication with and access to consular officers of the sending State;

"(b)   if he so requests, the competent authorities of the receiving state shall, without delay, inform the consular post of the sending state if, within its consular district, a

national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this subparagraph;

"\* \* \* \* \*

"(2)   The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this article are intended."

VCCR, Art 36, 21 UST 77, 100-01.

■    Defendant contends that subparagraph (1)(b) above clearly creates an individual right of consular access and notification, including a personal and enforceable right to be advised "without delay" of those rights. Defendant notes, in that regard, that the provision expressly makes consular notification a matter of personal election by the foreign national who is detained: It requires authorities to notify the detainee's consulate only "if [the detainee] so requests."[3] Defendant points out, also, that subparagraph (1)(b) explicitly refers to "rights" of consular notification and access, and describes those rights as belonging to the detained individual ("[t]he said authorities shall inform the person concerned without delay of *his* rights under this subparagraph" (emphasis added)).

Defendant further contends that, as a ratified treaty, the VCCR is a part of the "supreme law of the land"

---

[3] Defendant notes that another subparagraph of Article 36 that is not included in the quoted material above also makes consular *assistance* a matter of personal election by the person detained: Under subparagraph (1)(c) of Article 36 consular officers must refrain from acting on behalf of a detained national "if he expressly opposes such action."

and, as such, stands on equal footing with laws that the national legislature has enacted.[4] In defendant's view, that means that Article 36 is enforceable by affected individuals in the same way and to the same extent as any federal statute would be. With respect to that latter point, defendant appeals to the "doctrine of self-execution"—the idea that certain international treaties are "self-executing," that is, immediately effective and enforceable by individuals without additional implementing legislation.

■■ However, that is an issue of federal law, and the federal cases suggest that treaties are "self-executing," in the sense of permitting enforcement by an individual right of action, only when a specific intent to create such individual rights can be discerned from the treaty as a whole. *See, e.g., Edye v. Robertson*, 112 US 580, 598-99, 5 S Ct 247, 28 L Ed 798 (1894) ("Head Money Cases") ("A treaty * * * is a law of the land as an act of Congress is, *whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined.*" (emphasis added)); *Goldstar (Panama) S.A. v. U.S.*, 967 F2d 965, 968 (4th Cir 1992) ("Courts will only find a treaty to be self-executing if the document, as a whole, evidences an intent to provide a private right of action.").[5] In fact, the general rule, widely recognized in the federal courts, is that rights created by international treaties belong to the signatory state and are *not* enforceable in American courts by private individuals. Thus, the United States Supreme Court has stated:

---

[4] So far as it goes, defendant's point in that regard is unassailable. Article VI of the United States Constitution provides, in part:

"This Constitution, and the Laws of the United States * * * and all Treaties made, or which shall be made, under the Authority of the United States, *shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby,* any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

(Emphasis added.) Thus, as a ratified treaty, the VCCR is a part of the "supreme law of the land." But this case is not about the status *of* the VCCR; it is about defendant's status as an arrested national of a signatory state *under* the VCCR.

[5] In fact, it is at least arguable that the question whether a treaty is "self-executing"—enforceable without additional legislation—is different from the question whether it is individually enforceable in a judicial proceeding. *See U.S. v. Li*, 206 F3d 56, 67 (1st Cir 2000) (Selya and Boudin, JJ., concurring) (asserting that the two questions are different).

"A treaty is primarily a compact between independent nations. It depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it. If these fail, its infraction becomes the subject of international negotiations and reclamation, so far as the injured parties choose to seek redress. * * * It is obvious that with all this the judicial courts have nothing to do and can give no redress."

*Edye*, 112 US at 598. *See also Foster v. Neilson*, 27 US (2 Pet) 253, 306, 7 L Ed 415 (1829), *overruled in part on different grounds, U.S. v. Percheman*, 32 US 51 (1833) ("The judiciary is not that department of the government, to which the assertion of its interests against foreign powers is confided."); *Goldstar (Panama) S.A.*, 967 F2d at 968 ("International treaties are not presumed to create rights that are privately enforceable.").

The rationale for the foregoing general rule (which in substance amounts to a presumption *against* the creation of individual, judicially enforceable rights) is obvious. The United States Constitution separates the various functions of government among the three branches, generally placing the powers that relate to foreign relations in the Executive Branch (with certain oversight powers, including the power to ratify treaties, in the Legislative Branch). The necessary and beneficial corollary of that constitutional arrangement is that, in matters of international relations, the nation speaks through a single authoritative voice—the president. That beneficial effect, and the separation of powers principle itself, would be undermined if the Judicial Branch were to presume to enforce treaty provisions on behalf of individuals when its authority to do so is less than clear.[6]

---

[6] The concurring judges in *Li* aptly described the "mischief" that could result from allowing individuals to seek redress through the courts when the Executive Branch has not intended or contemplated that result:

"There is an elaborate regime of practices and institutions by which the United States and other nations enforce commitments *inter sese* or decide that, in the national interest, promises given by or to another sovereign should not be enforced in a specific case. Sometimes this is done purely for reasons of prudence, sometimes for convenience, or sometimes to secure advantage in unrelated matters. Incalculable mischief can be wrought by gratuitously introducing into this often delicate process court enforcement at the instigation of private parties."

■     In acknowledging the foregoing general rule, we do not mean to say that a court never can read a treaty to create privately enforceable rights. Certainly, the noted presumption can be overcome by explicit wording and even by provisions that necessarily imply a private right of judicial enforcement. For example, courts have allowed individuals judicially to enforce treaties that govern the rights of foreign nationals to inherit property, despite the absence of explicit treaty wording providing for such individual enforcement, most likely because the right-granting wording in those treaties makes sense only if it is read to confer an individually enforceable right. *See, e.g., Clark v. Allen*, 331 US 503, 507-08, 67 S Ct 1431, 91 L Ed 1633 (1947) (dealing with such a treaty). On the other hand, an individual right of judicial enforcement will not be inferred from the mere fact that a treaty sets out substantive rules of conduct that, if honored, would benefit individuals. *See, e.g., Argentine Republic v. Amerada Hess Shipping*, 488 US 428, 442, 109 S Ct 683, 102 L Ed 2d 818 (1989) (holding that Geneva Convention on the High Seas, which provides that illegally boarded merchant ship "shall be compensated for any loss or damage that may have been sustained," does not create private right of action for foreign corporations to recover compensation in United States courts); *United States ex rel Lujan v. Gengler*, 510 F2d 62, 67 (1975), *cert den*, 421 US 1001 (1975) ("[E]ven where a treaty provides certain benefits for nationals of a particular [signatory] state—such as fishing rights—it is traditionally held that 'any rights arising from such provisions are, under international law, those of the [signatory] states and * * * individual rights are only derivative through the [signatory] states.'") (quoting *Restatement (Second) of the Foreign Relations Law of the United States* § 115, comment e (1965)).

With those considerations in mind, we turn to defendant's proposed interpretation of Article 36 of the VCCR. Although defendant is correct that Article 36 expressly refers to the detained foreign national's "rights" to consular access and notification, the mere use of the term "rights" cannot, by

---

206 F3d at 68 (Selya and Boudin, JJ., concurring.) Those comments would apply with even more force to the prospect of uneven enforcement in the various state courts.

itself, support an intent to require signatory states to allow individual detainees to enforce those "rights" in a criminal proceeding against them—particularly when the treaty does not specify the nature of the declared "rights" or any remedy that is required for their breach. In fact, it seems likely that the treaty refers to a detainee's "rights" to consular access and notification purely because that is the most convenient and comprehensible way of describing what a receiving signatory state must tell a foreign detainee in order to meet the signatory state's obligations under the treaty. *See U.S. v. Li*, 206 F3d 56, 66 (1st Cir 2000) (Selya and Boudin, JJ., concurring) (making that point).

Neither does any other wording in the treaty suggest an intent to create individual rights that are enforceable in a judicial proceeding. In fact, the purposes stated in the preamble (to "contribute to the development of friendly relations among nations") and in the initial clause of Article 36 ("with a view to facilitating the exercise of consular functions relating to nations of the sending state") both suggest that the treaty and Article 36 are concerned with relationships and obligations among *nations*, not with individual rights.[7]

Finally, there is nothing about the subject matter of the VCCR that would compel an inference that a private right of action was intended. In that regard, we think it is perfectly reasonable to read the treaty as leaving enforcement of Article 36 entirely to the signatory states.

We have described a general presumption that international treaties speak only to the rights and obligations of signatory states and do not confer individual rights that are

---

[7] At the same time, we note in passing that we are unimpressed by the state's contention that the Preamble to the VCCR contains a clear *denial* of an intent to create individual rights. The state focuses on the following wording:

"Believing that an international convention on consular relations, privileges and immunities would also contribute to the development of friendly relations among nations, irrespective of their differing constitutional and social systems, *[and r]ealizing that the purpose of such privileges and immunities is not to benefit individuals* but to ensure the efficient performance of functions by consular posts on behalf of their respective states."

VCCR, 21 UST at 79 (emphasis added). It is at least arguable that the emphasized clause refers to privileges and immunities of individual consular officials and that, as such, it says nothing about the rights of individual foreign detainees.

enforceable in judicial proceedings. We also have noted that, although Article 36 of the VCCR loosely refers to a foreign detainee's "rights" to consular access and notification, it contains no explicit statement or clear implication of an intent to depart from that general rule. In the absence of any such clear indication to the contrary, we must conclude that the obligations that Article 36 describes are enforceable only by the affected signatory states and not by individual detainees.

■ That conclusion is confirmed by the fact that, since at least 1970, the State Department has maintained that the VCCR does not create enforceable individual rights and that "the only remedies for failures of consular notification under the [VCCR] are diplomatic, political, or exist *between [signatory] states* under international law." *Li*, 206 F3d at 63-64 (emphasis supplied); *U.S. v. Emuegbunam*, 268 F3d 377, 392 (6th Cir 2001) (citing *Li*).[8] The State Department's interpretation of any international treaty is entitled to substantial weight, because that department of the federal Executive Branch is responsible for negotiating and administering treaties, and also because it generally is the "single authoritative voice" through which the Executive· Branch speaks. *Li*, 206 F3d at 67 (Selya and Boudin, JJ., concurring).[9]

We conclude that Article 36 of the VCCR does not create rights to consular access or notification that are enforceable by detained individuals in a judicial proceeding. It follows that defendant's suppression motion in the present case, grounded in the theory that the police had violated his

---

[8] It also is confirmed by the fact that, of the one hundred plus nations that have signed the VCCR, none apparently provides an individual remedy through its criminal justice system for violations of the sort that is at issue here. *Emuegbunam*, 268 F3d at 393.

[9] Defendant contends that the State Department's position deserves little weight because it only has taken that position for purposes of litigation. It appears, however, that the State Department's announced position has been consistent since at least 1970. *Emuegbunam*, 268 F3d at 392.

Defendant also contends that the State Department's nonlitigation position is quite different. In so arguing, defendant relies primarily on the fact that various internal State Department documents and publications refer to an arrested foreigner's "right" to consular access without delay. However, as we have noted above, 338 Or at 274-75, the mere use of the term "rights" does not necessarily convey acceptance of an individual right enforceable in judicial proceedings.

rights under Article 36 of the VCCR, was not well taken, and the trial court did not err in denying it.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.[10]

---

[10] Our legal conclusion in this case is consonant with every other state and federal case of which we are aware that has addressed the issue. *See, e.g., Emuegbunam,* 268 F3d at 390-94; *U.S. v. Jimenez-Nava,* 243 F3d 192, 192, 195-98 (5th Cir 2001), *cert den,* 533 US 962 (2001); *State v. Martinez-Rodriguez,* 131 NM 47, 54, 33 P3d 267, 271-74 (2001), *cert den,* 535 US 937 (2002); *Kasi v. Commonwealth,* 256 Va 407, 419, 508 SE2d 57, 63-64 (1998), *cert den,* 527 US 1038 (1999); *State v. Navarro,* 260 Wis 2d 861, 865-74, 659 NW2d 487, 489-94 (2003), *rev den,* 661 NW2d 101 (2003); *see also Li,* 206 F3d at 66-68 (Selya and Boudin, JJ., concurring). We also note that the Supreme Court of the United States on December 10, 2004, granted *certiorari* in *Medellin v. Dretke,* 371 F3d 270 (5th Cir 2004). That case, which is set for argument on March 28, 2005, involves certain of the issues that we decide today.