Argued and submitted September 12, judgment of conviction and sentence of death affirmed November 9, 2006, petition for reconsideration denied January 10, 2007

## STATE OF OREGON,
*Plaintiff on Review,*

*v.*

## CHRISTIAN MICHAEL LONGO,
*Defendant on Review.*

(CC 016441; SC S50474)

148 P3d 892

Rankin Johnson, IV, Portland, argued the cause for defendant on review. With him on the briefs were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Office of Public Defense Services, Salem.

Rolf C. Moan, Assistant Attorney General, argued the cause for plaintiff on review. With him on the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Christina M. Hutchins, Assistant Attorney General, Salem.

Before De Muniz, Chief Justice, and Carson, Gillette, Durham, Balmer, and Kistler, Justices.*

---

\* Riggs, J., retired September 30, 2006, and did not participate in the consideration or decision of this case. Walters, J., did not participate in the consideration or decision of this case.

DE MUNIZ, C. J.

## DE MUNIZ, C. J.

This matter is before the court on automatic and direct review of defendant's sentence of death for seven counts of aggravated murder. Defendant pleaded guilty to the aggravated murder of his wife, Mary Jane Longo, and his two-year-old daughter Madison. At trial, a jury convicted him of also murdering his four-year-old son Zachery and his three-year-old daughter Sadie.[1] For the reasons discussed below, we affirm the judgment of conviction and the sentence of death.

## I. FACTS

Because the jury found defendant guilty, we present the facts in the light most favorable to the state. *See, e.g., State v. Moore*, 324 Or 396, 398, 927 P2d 1073 (1996) (so noting).

The first hints of the events that would unfold in Oregon came roughly 18 months before the crimes, while defendant was living with his family in Michigan. On May 26, 2000, Mary Jane Longo called her sister; she was very upset. Mary Jane told her sister that she had discovered e-mails from defendant to another woman; that she had confronted defendant with those e-mails; and that defendant had told her that he did not love her anymore, that she spent too much time and attention on the children, and that she was no fun since they had had children.

In early 2001, because of various financial and legal problems, defendant and the family moved to Ohio and lived for a time in a warehouse. After defendant became a suspect in the murders, police searched that warehouse. There they discovered items that had been left behind by the Longos,

---

[1] Defendant was indicted on seven counts of aggravated murder. The first four counts involved the murder of Mary Jane, Zachery, Sadie, and Madison. Each count alleged aggravated murder because there had been more than one murder victim in the criminal episode. ORS 163.095(1)(d). The last three counts alleged the aggravated murder of Zachery, Sadie, and Madison, because the victims were each under the age of 14. ORS 163.095(1)(f). Defendant pleaded guilty to counts 1, 4, and 7 (one count involving Mary Jane's murder, and two counts for murdering Madison). Defendant was convicted at trial of the remaining four counts (two counts each for murdering Zachery and Sadie).

including Mary Jane's wedding dress and wedding photos of defendant and Mary Jane. There were also two books: one was a Spanish phrasebook, and the other was a book entitled *The Modern Identity Changer*.

Defendant and his family soon left Ohio, arriving on the Oregon coast in early September 2001. They settled in the Newport area. Defendant was hired as a part-time employee in the Starbucks coffee outlet located in the local Fred Meyer department store.

Defendant and his family moved into the Newport Motor Inn around the first of November 2001. Defendant told the manager that he had been sent down from Portland to help set up the Starbucks outlet.

On November 19, 2001, defendant printed off from the Internet the obituaries for four young adult men from the area. Those printed obituaries would later be found in defendant's locker at work. Handwritten on three of the printed obituaries were social security numbers. When police later captured defendant, he had in his possession one of the four names.

On November 20, 2001, defendant stole a credit card receipt from a customer making a purchase at Starbucks. After the murders, defendant used that credit card information to buy a plane ticket to Texas.

About November 30, 2001, defendant and his family moved into a condominium. Defendant told the condominium manager and the front desk person that defendant worked as a subcontractor for Qwest surveying the coast for DSL (a type of high-speed Internet service). Defendant claimed to both that he had only two children, not three. Defendant also claimed that his family lived out of town, but he said that they would visit some weekends.[2]

Defendant had one vehicle, a maroon minivan with an out-of-state license plate reading "KID VAN."[3] On

---

[2] Defendant varied his story about where his family lived. He told the manager that they lived in Hillsboro, but he told the front desk person Tigard.

[3] Defendant did not own the minivan; he admitted at trial that he had stolen the minivan in Ohio, and that he had registered the license plate "KID VAN" for another car that he had owned at the time.

December 9, 2001, defendant and his family looked at a green Dodge Durango at the Town and Country Dodge dealership in Wilsonville.

On December 15, 2001, a Saturday, defendant did not work. That night, Denise Thompson, a coworker of defendant's, babysat the children so that defendant and Mary Jane could go to dinner and a movie. Defendant and his wife returned about 10:30 p.m. As far as can be determined, that was the last time anyone other than defendant saw Mary Jane Longo or the children alive.

It is not clear exactly when defendant committed the crimes. At 2:00 a.m. on the morning of Sunday, December 16, a couple staying in the room directly above the Longos, Mr. and Mrs. Crabb, were awakened by dragging noises that continued for five to 15 minutes. Mrs. Crabb believed that the noises were coming from downstairs. Mr. Crabb thought that the noises came from next door; he called the apartments on either side, but no one answered. The next morning, the Crabbs complained at the front desk. They were told that no one had been in the rooms on either side of them.

Defendant's recorded interview with police suggested that the murders took place in the early morning hours of Monday, December 17. Defendant implied that he killed his family after returning home from work at 11:00 p.m. He indicated that it was either Sunday or Monday, but he could not remember which. Defendant's work records show that he did not work on Saturday; he did work until 11:00 p.m. on both Sunday and Monday, December 16 and 17.

In his recorded statement, defendant said that, when he got home after 11:00 p.m., everyone was asleep. He had some wine and cheese, went onto the deck to think about his financial problems, then came back in and lay down in bed next to Mary Jane. Madison, the youngest child, was sleeping on the floor of the bedroom on a comforter. Zachery and Sadie slept in the living room on the couch. Defendant lay awake for a couple of hours, worrying about his financial problems. In his recorded statements to police, defendant did not further describe the crime, but he did say that he had "been reliving it [those events] every night."[4]

---

[4] At trial, defendant admitted that the events of the night of December 16-17 were as he had told the police. However, defendant denied that any murders took

Mary Jane was manually strangled. Her nude body was put into a suitcase and dumped off the dock at the Embarcadero Marina. Madison, the two-year-old, also was strangled; her body was put into a different suitcase and dumped off the same dock. Zachery and Sadie (ages four and three, respectively) both died of asphyxiation, but the medical examiner could not be more specific. The body of Sadie Longo was tied to a rock and dropped off a bridge on Highway 34 near Waldport. The body of Zachery Longo was found floating near the same bridge. Near where Sadie's body was later found, divers located a large rock inside a child's pillowcase that had been twisted shut.

At about 4:30 a.m. on Monday morning, December 17, a construction worker was driving on Highway 34 near Waldport. He found a red minivan stopped in the middle of a bridge. The worker stopped and asked the driver, a man, whether he needed any help. The driver said that he did not; he had pulled over because his "check engine" light had come on.

Later the same morning, at about 8:00 a.m., the harbor master at the Embarcadero Marina noticed a broken pipe under a ramp at the marina. Divers later discovered the suitcases containing the bodies of Mary Jane and Madison in the water just beneath where the pipe had been broken.

Defendant worked on Monday, December 17, from 2:00 p.m. to 11:00 p.m.

Defendant did not work Tuesday, December 18. That day, the housekeeping staff at the Newport Motor Inn discovered that someone had put in their trash dumpster children's clothes, baby books, and a wallet containing Mary Jane's driver license.

That afternoon, someone stole a green Dodge Durango from the Town and Country Dodge dealership in

---

place that night. He claimed that he had killed only Mary Jane and Madison, sometime after he returned from work at 11:00 p.m. on Tuesday, December 18.

Defendant testified that Mary Jane had killed Zachery and Sadie and (he had believed initially) Madison. Defendant said that he strangled Mary Jane when he discovered that. Afterward, defendant claimed, he discovered that Madison was still breathing, but he strangled her because she was unresponsive. Defendant implied that Mary Jane had dumped Zachery and Sadie off the bridge near where their bodies were later found.

Wilsonville and left behind a maroon minivan. Although the license plate had been removed from the minivan, the foam underneath showed the impression of the letters "KID VAN." Inside the minivan were two other different license plates.

Late in the afternoon on December 18, defendant spoke with the manager at the condominium. Defendant told the manager that he had taken his wife and children to the airport, and that he and Mary Jane were having marital problems.

Defendant attended a Christmas party for Starbucks employees the same night. He was driving a green Dodge Durango. Defendant told Denise Thompson and another coworker that he had taken his wife and children to the airport. The party involved a gift exchange, and defendant gave the recipient of his gift a bottle of perfume. The bottle was not new; it had belonged to Mary Jane.

On Wednesday, December 19, defendant worked from 5:00 a.m. to 2:00 p.m. That day, defendant told Thompson and another coworker that his wife was having an affair, and that she had left him for the other man.[5] He named the man supposedly involved. Defendant claimed to Thompson that he was not sure whether Madison was his own child.

In the same conversation, defendant told Thompson that he had put the minivan in storage in Portland. Defendant also told Thompson that he wanted to install a CD player in the Durango. Thompson made arrangements for her and her husband to accompany defendant on Saturday to buy a CD player that Thompson's husband would install.

That afternoon, defendant rented a movie.

The same day, December 19, police discovered Zachery's body.

On Thursday, December 20, defendant again worked from 5:00 a.m. to 2:00 p.m. He later played volleyball with a coworker.

---

[5] A total of five different coworkers testified that defendant had claimed that his wife had been having an affair and had left him for the other man.

Thompson tentatively identified Zachery's body on December 21.

On December 21, defendant fled the state and headed for San Francisco. After he arrived, he applied for a job at a local Starbucks. Then, however, defendant decided to flee to Mexico. On December 26, defendant purchased a plane ticket using the information from the stolen credit card receipt. He left the green Dodge Durango in the parking lot at San Francisco International Airport. In the Durango, police later found the license plate "KID VAN," as well as defendant's checkbook, marriage license, and diploma.

Police captured defendant on January 13, 2002, less than one month after the murders. At the time, defendant was staying at a campground near Cancun, Mexico. At the campground, defendant had told other people he was a writer for the New York Times. He had been touring local ruins and other sights. At the time of his capture, defendant was sharing a cabana with a woman, and he admitted that he had been sexually intimate with her.

While defendant was being returned to the United States, the FBI agent accompanying defendant asked him about the murders. Defendant replied, "I sent them to a better place."

## II. ANALYSIS

Defendant makes 26 assignments of error. We have reviewed each one. We discuss a number of them below. We reject the remainder, because we conclude that they are unpreserved, or are controlled by this court's prior decisions, or are meritless.

A. *Guilt Phase*

1. *Whether Defendant's Rights Under the Vienna Convention on Consular Relations or Other International Law Prohibit Imposing the Death Penalty*

■ Prior to trial, defendant filed a motion requesting that the trial court prohibit imposition of the death penalty or a life sentence in defendant's case. Defendant's argument turns on his having been captured in Mexico. In support of

his motion, defendant presented evidence that Mexico generally refuses the attempted extradition of fugitives who face the death penalty or life imprisonment, unless the extraditing state agrees to waive those punishments. As he did in the trial court, defendant seeks to get the benefits that he claims he would have had if he had insisted on being formally extradited. Accordingly, defendant argues that the trial court should have either dismissed the capital murder charges (leaving noncapital aggravated murder charges) or prohibited the imposition of the death penalty or a life sentence.

Defendant bases that argument on the claim that he has personal and individually enforceable rights under the Vienna Convention on Consular Relations, April 24, 1963, 21 UST 77 (VCCR). Defendant contends that the FBI agent who explained defendant's options about returning to the United States was functioning at the time as a "consular officer" within the meaning of the VCCR. Under the VCCR, defendant argues, the agent had a legally enforceable duty to advise defendant to obtain local counsel. Defendant asserts that, had he consulted with local counsel, that counsel would have told defendant to insist on formal extradition, ultimately preventing the state from imposing the death penalty. Defendant contends that the FBI agent instead misled and deceived defendant into returning to the United States voluntarily.

The trial court made the following findings of fact in a written order denying defendant's motion to prohibit imposition of the death penalty or a life sentence. Special Agent Clegg is an FBI agent assigned to the FBI office in Mexico City. The trial court noted that "Mr. Clegg is a 'diplomat,' but as such has no law enforcement authority in Mexico." The FBI has no authority to make arrests in Mexico. Although the trial court did not make specific findings on whether Clegg functioned as a consular officer, Clegg testified that he did not.

On January 13, 2002, Clegg received information that defendant was at a campground near Tulum, in the Mexican state of Quintana Roo. Clegg flew to Cancun and met with the chief of the Quintana Roo police. About one

dozen Mexican police officers, joined by Clegg, then traveled to Tulum to arrest defendant.

Mexican police, not Clegg, arrested defendant. The police, Clegg, and defendant then returned to Cancun. After they arrived in Cancun, Clegg advised defendant of the three options available to him: extradition, deportation, or voluntary return. The trial court found that "[t]here is no evidence that Special Agent Clegg was anything but truthful with the Defendant as to these options * * * or that the options discussed weren't properly laid out." Defendant then emphatically indicated that he did not want to spend time in a Mexican jail; he wanted to return to the United States. Clegg informed the chief of police, who confirmed defendant's decision.

The next flight back to the United States left the following morning at 7:20 a.m. Defendant stayed at the police station all night with Special Agent Clegg. He was not held in a jail cell or mistreated by Mexican police. Virtually no conversation took place at the station.

Mexican police, accompanied by Clegg, took defendant to the airport the next morning, where he boarded a plane for the United States.

After returning to the United States, defendant signed a statement in which he acknowledged that he had voluntarily returned to the United States without any promises or threats.[6]

Clegg did not notify defendant that he had a right to contact the United States consulate, and as far as Clegg knew, the Mexican police officers did not do so, either. Defendant offered some evidence that the United States consular official would have told defendant that he was in serious trouble and given defendant a list of local attorneys.

In contending that he has individually enforceable rights under the VCCR, and that those rights were violated,

---

[6] Although the trial court's order fails to note when defendant signed that statement, the evidence showed that it happened after defendant had returned to the United States.

defendant relies mainly on Article 36 of the VCCR, which provides, in part:

> "1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:
>
> "* * * * *
>
> "(b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this subparagraph;
>
> "(c) consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation. * * * Nevertheless, consular officers shall refrain from taking action on behalf of a national who is in prison, custody or detention if he expressly opposes such actions.
>
> "2. The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended."

VCCR, Art 36, 21 UST at 100-01.

This court already has concluded that Article 36 of the VCCR does not create an individually enforceable right. "[T]he obligations that Article 36 describes are enforceable only by the affected signatory states and not by individual detainees." *State v. Sanchez-Llamas*, 338 Or 267, 276, 108 P3d 573 (2005), *aff'd on other grounds sub nom Sanchez-Llamas v. Oregon*, ___ US ___ , 126 S Ct 2669, 165 L Ed 2d 557 (2006).[7]

---

[7] If Clegg had functioned as a consular official, as defendant argues, then Mexican police officers would have had no need to advise defendant of his right to contact the United States consulate. Even setting that aside, defendant did not

Moreover, defendant confuses permission with duty. The VCCR gives a country the opportunity to help its nationals, but it does not force the country to do so. Article 36 gives *"consular officers"* "the *right* to visit a national of the sending State who is in * * * custody or detention, * * * and to arrange for his legal representation" (emphasis added); the VCCR does not make it a *duty* for consular officers to do so. The stated purpose of Article 36 is to "facilitat[e] the exercise of consular functions," not to mandate that consular officials will perform those functions. In our view, the VCCR did not put on the United States any duty to help defendant get local counsel in Mexico.

**2.** Defendant also relies on the extradition treaty between the United States and Mexico (Extradition Treaty, US - Mex, May 4, 1978, 31 UST 5059). But that, too, does not help defendant. Nothing in that treaty makes formal extradition the sole means by which fugitives may be returned to the United States. *See United States v. Alvarez-Machain*, 504 US 655, 668-69, 112 S Ct 2188, 119 L Ed 2d 441 (1992) (rejecting argument that Mexican national, forcibly kidnapped from Mexico and returned to United States, could not be prosecuted; "to infer from this Treaty and its terms that it prohibits all means of gaining the presence of an individual outside of its terms goes beyond established precedent and practice").

Finally, defendant claims that Clegg had some duty to defendant under the Department of State's Foreign Affairs Manual. But even if the consular officer portions of the Foreign Affairs Manual somehow applied to Clegg—an issue that we need not decide—the Foreign Affairs Manual is not a source of law. *See Scales v. I.N.S.*, 232 F3d 1159, 1166 (9th Cir 2000) (stating that Foreign Affairs Manual had not been arrived at after notice-and-comment rulemaking, and that such "agency manuals" "lack the force of law" (internal quotation marks and citation omitted)).

---

offer any evidence of how Mexican law responds to the failure to inform a person of rights under the VCCR. *See* VCCR, Art 36(2) (rights "shall be exercised in conformity with the laws and regulations of the receiving State"—here, Mexico). And even assuming that United States law governed, this court's decision in *Sanchez-Llamas* holds that the VCCR does not create an individually enforceable right.

In sum, we reject all defendant's arguments based on the manner of his return from Mexico.

2. ██ ██ 
 ██ 

 Before trial, defendant argued that the court should suppress some of his statements to police, in order to cure alleged violations of his *Miranda* rights. Defendant renews those arguments on review.

The trial court made extensive findings of fact on the question and rejected defendant's arguments for suppression. Defendant did not make any statements regarding the crime until after he was in United States custody, and after he had been given his *Miranda* warnings at the airport. Defendant then had three interviews with police: the first with Agent Clegg on the plane back to the United States, the second in Texas with Agent Clegg and two other officers, and the third in Newport, after defendant returned to Oregon. Before all three interviews, police either gave defendant *Miranda* warnings or reminded him that he had been so advised earlier.

In all three interviews, defendant refused to answer particular questions or to discuss certain subjects. In several of those cases, he indicated that he wanted to speak with someone else or to get some advice before discussing those matters, but defendant never identified who he meant.

The trial court found, and defendant does not contest, that "at *no time* did the [d]efendant *ever* say that he wished to consult counsel, 'consult legal advice[,]' or ask for a lawyer." (Emphasis in original.) The trial court also rejected the claim that defendant's refusal to discuss some subjects amounted to an invocation of the right to remain silent. Defendant "wanted to talk about his case, that is clear, and in doing so did not invoke at any time a right to remain silent or his desire to speak with counsel. To the contrary, he wanted to *keep on talking*." (Emphasis in original.) Defendant "wished to continue discussing his situation with the police, so [he] made the call [respecting] which areas he would and would not discuss[.]" The police officers were "*very* credible witnesses who gave [defendant] *every opportunity* without

pressure to say, or not say, what he wanted or that which was on his mind." (Emphasis in original.)

Under the circumstances, we reject defendant's argument that the court should have suppressed his statements to police.[8] *See State v. Kell*, 303 Or 89, 99, 734 P2d 334 (1987) (no *Miranda* violation when defendant unequivocally asked for lawyer before talking about some subjects, but otherwise continued speaking to police; "[d]efendant was entitled to pick and choose what he wished to talk about").

3. *Whether the State Unconstitutionally Used Peremptory Challenges to Exclude Minority Group Members from the Jury*

During *voir dire*, defendant contended that the state unconstitutionally used peremptory challenges to eliminate minority jurors from the jury panel. Defendant renews those arguments here.

*Voir dire* began on Tuesday, February 18, 2003. Juror number 1853 was examined that day and the following, February 19. The parties passed her for cause.

The next day, February 20, juror number 627, a woman from South Korea, appeared as a potential juror. The parties passed her for cause, but later that day the state struck her with its fourth peremptory challenge. Defendant did not object.

*Voir dire* continued on Friday, February 21, then skipped the weekend and began again on Tuesday, February 25. On Wednesday, February 26, the state used its tenth peremptory challenge to strike juror 1853. Defendant then

---

[8] Defendant also argues that his statements should have been suppressed under the VCCR, or because they were involuntarily given out of a fear of Mexican jails. As previously noted, this court has held that a defendant does not have individual right under the VCCR. *State v. Sanchez-Llamas*, 338 Or 267, 276, 108 P3d 573 (2005). Moreover, in that case the United States Supreme Court, although assuming without deciding that the VCCR created individual rights, nevertheless concluded that suppression would not be an appropriate remedy for any violations. *Sanchez-Llamas v. Oregon*, _____ US _____ , 126 S Ct 2669, 2677-78 & 2682, 165 L Ed 2d 557 (2006).

Because defendant made his first statements about the crimes only after he was on a plane back to the United States, we also find meritless defendant's argument that the statements were made from fear of Mexican jails.

objected, arguing that the state had violated *Batson v. Kentucky*, 476 US 79, 89, 106 S Ct 1712, 90 L Ed 2d 69 (1986): Of approximately 50 jurors that had been examined to that point, only jurors 1853 and 627 were members of a racial or ethnic minority, and the prosecution had struck both.[9]

It is not clear from the record whether juror 1853 was actually a member of a racial or ethnic minority. Defendant's counsel argued that she was "probably Native American," though he had first thought she might be Hispanic. In response, the prosecution stated that they thought that juror 1853 was Caucasian. The court later said:

> "* * * I saw the juror myself, and I would not be able to say that she was of ethnic—African American, Native American—I mean, I—I couldn't tell what her racial background is. Native American is what you said. And frankly she looked like—just like everybody else we've seen on the jury, with the exception of [juror 627] who is Asian."

The trial court refused to bring juror 1853 back to question her about her race. Instead, the court orally ruled that defendant had failed to establish a *prima facie* case of discrimination.

However, the state also asked for the opportunity to offer a neutral explanation why they had challenged juror 1853. The state did so the next day, explaining that they were concerned from her answers on *voir dire* that juror 1853 might not be able to impose the death penalty. At the conclusion of that colloquy, the trial court said that the state's explanation "makes moot the issue now before the Court."[10]

The same day as that oral ruling, the trial court signed a written order denying defendant's motion on the ground that defendant had failed to make a *prima facie* case of purposeful discrimination. In the order, the trial court

---

[9] The *voir dire* record shows that 45 potential jurors had been individually interviewed when defendant made his *Batson* challenge.

[10] In *Hernandez v. New York*, 500 US 352, 111 S Ct 1859, 114 L Ed 2d 395 (1991), a plurality of the justices concluded that, after the state offered a race-neutral justification and the trial court ruled on whether there had been intentional discrimination, it rendered moot any need to decide whether defendant had made out a *prima facie* case of discrimination. *Id.* at 359.

noted the dispute regarding whether juror 1853 was a minority, adding that "this court has no reason to believe the juror is of a racial minority[.]" The court also indicated that it had reviewed the recorded questioning of juror 1853, and that nothing in the questioning "would lead the court to believe the State's challenge of either juror was racially motivated[.]" Finally, the court also noted that the state had disclosed its reason for challenging juror 1853, "which reason was based upon the State's belief the juror might not be able to fulfill her duties as required by law."

ORCP 57 D(4), made applicable to criminal proceedings by ORS 136.230(4), prohibits any party from using peremptory challenges to discriminate, and sets out the procedure for such challenges.

"D(4)(a) A party may not exercise a peremptory challenge on the basis of race, ethnicity or sex. Courts shall presume that a peremptory challenge does not violate this paragraph, but the presumption may be rebutted in the manner provided by this section.

"D(4)(b) If a party believes that the adverse party is exercising a peremptory challenge on a basis prohibited under paragraph (a) of this subsection, the party may object to the exercise of the challenge. The objection must be made before the court excuses the juror. The objection must be made outside of the presence of potential jurors. The party making the objection has the burden of establishing a prima facie case that the adverse party challenged the potential juror on the basis of race, ethnicity or sex.

"D(4)(c) If the court finds that the party making the objection has established a prima facie case that the adverse party challenged a prospective juror on the basis of race, ethnicity or sex, the burden shifts to the adverse party to show that the peremptory challenge was not exercised on the basis of race, ethnicity or sex. If the adverse party fails to meet the burden of justification as to the questioned challenge, the presumption that the challenge does not violate paragraph (a) of this subsection is rebutted.

"D(4)(d) If the court finds that the adverse party challenged a prospective juror on the basis of race, ethnicity or sex, the court shall disallow the peremptory challenge."

That procedure corresponds with the constitutional requirements explained by the United States Supreme Court in *Batson* and subsequent cases. *See, e.g., Johnson v. California*, 545 US 162, 168, 125 S Ct 2410, 162 L Ed 2d 129 (2005) (summarizing requirements).[11]

However, we note a recent constitutional development in this area of the law. In *Batson*, the United States Supreme Court had said that the party must initially make out a *"prima facie* case" of purposeful discrimination. 476 US at 93-94; *see* ORCP 57 D(4)(b) (requiring same). In 2005, however, *Johnson* held that the initial burden on a defendant is less than the words *"prima facie* case" might suggest.

In *Johnson*, the California Supreme Court had concluded that a *"prima facie* case" of discriminatory challenges meant a showing that, more likely than not, the challenges were the product of purposeful discrimination. 545 US at 167 (California court concluded that *prima facie* case requires "strong evidence that makes discriminatory intent *more likely than not* if the challenges are not explained" (internal quotation marks and citations omitted; emphasis in original)).

The United States Supreme Court, however, held that that standard was too high.

"We did not intend the first step to be so onerous that a defendant would have to persuade the judge—on the basis of all the facts, some of which are impossible for the defendant to know with certainty—that the challenge was more likely than not the product of purposeful discrimination. Instead, a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the

---

[11] In *Johnson* the Court summarized the procedure as follows:

"First, the defendant must make out a *prima facie* case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose. Second, once the defendant has made out a *prima facie* case, the burden shifts to the State to explain adequately the racial exclusion by offering permissible race-neutral justifications for the strikes. Third, if a race-neutral explanation is tendered, the trial court must then decide * * * whether the opponent of the strike has proved purposeful racial discrimination."

545 US at 168 (footnote, internal quotation marks, and citations omitted; alteration in original).

trial judge to draw an inference that discrimination has occurred."

*Johnson*, 545 US at 170.

■ Courts should examine "the totality of the relevant facts" to decide whether they may infer purposeful discrimination.

> "For example, a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during *voir dire* and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative. We have confidence that trial judges, experienced in supervising *voir dire*, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a *prima facie* case of discrimination against black jurors."

*Batson*, 476 US at 97.

Here, the trial court found "no reason to believe" that juror 1853 was a racial minority, and we must defer to that finding. *See State v. Nefstad*, 309 Or 523, 528, 537-38, 789 P2d 1326 (1990) (giving "great weight" to trial court's impressions of potential juror in reviewing court's decision to exclude juror for cause); *see also Hernandez v. New York*, 500 US 352, 364-69, 111 S Ct 1859, 114 L Ed 2d 395 (1991) (concluding that trial court's findings at third step of *Batson* were reviewed for clear error).[12] We must conclude, then, that juror 1853 appeared to be Caucasian, regardless of what her actual racial heritage may have been. Viewed in that manner, the peremptory challenge of an apparently Caucasian juror adds nothing to defendant's *prima facie* case.

We agree with the trial court, too, that the evidence fails to make out a *prima facie* case. The record does not show a pattern of questioning by the prosecutor suggestive of racial discrimination. *See Batson*, 476 US at 97 (identifying that form of evidence). And the state's peremptory challenge to juror 627 does not show a "pattern" of challenges to minority

---

[12] Although *Hernandez* involved a four-justice plurality, two other justices specifically concurred in the standard of review. 500 US at 372.

jurors. *See id.* ("a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination"). Without something more, the striking of a single member of a minority group from a jury is not enough "to permit the trial judge to draw an inference that discrimination has occurred." *Johnson*, 545 US at 170.[13]

We reject defendant's arguments that the state violated *Batson v. Kentucky*.[14]

### 4. *Whether the State Committed a Discovery Violation in its Handling of the Crabb Testimony*

■ Defendant here assigns errors relating to the testimony by the Crabbs about the noises that they heard in the early morning hours of December 16, 2001.

The Crabbs were last-minute witnesses. An investigator for the state first interviewed the Crabbs on March 12, 2003, two days *after* opening statements in the trial. That same day, the investigator prepared a brief memorandum that was immediately submitted to the defense. Although

---

[13] Defendant argues that *State v. Henderson*, 315 Or 1, 843 P2d 859 (1992), held that striking a single minority juror could qualify as a *prima facie* case under *Batson*. With appropriate supporting facts, that may be true. *Henderson*, however, did not decide what constituted a *prima facie* case; for procedural reasons, this court assumed that defendant had made out a *prima facie* case, and proceeded to *Batson's* second and third steps. *See id.* at 5 n 3 (matter had been decided in earlier appellate proceedings, and state had not sought review).

[14] Defendant also claims a Sixth Amendment fair-cross-section violation for excluding jurors opposed to the death penalty, ex-felons, and persons for whom jury service would be a financial hardship. However, defendant concedes that the United States Supreme Court rejected his argument regarding excluding jurors opposed to the death penalty in *Lockhart v. McCree*, 476 US 162, 174, 106 S Ct 1758, 90 L Ed 2d 137 (1986). He also concedes that this court has rejected his argument regarding excluding ex-felons. *State v. Compton*, 333 Or 274, 288-89, 39 P3d 833, *cert den*, 537 US 841 (2002).

Defendant's argument regarding excluding jurors for financial hardship also is meritless. The fair-cross-section guarantee only covers the jury venire, not the particular petit jury. The Supreme Court has specifically recognized that excusing individual jurors for financial hardship is permissible, though systematically excluding an economic class may be unconstitutional. *See Thiel v. Southern Pacific Co.*, 328 US 217, 224, 66 S Ct 984, 90 L Ed 1181 (1946) ("It is clear that a federal judge would be justified in excusing a daily wage earner for whom jury service would entail an undue financial hardship" (footnote omitted), though *automatically* excluding all daily wage earners from the jury venire violated proper jury selection principles.). Nothing like that occurred in this case.

Mrs. Crabb had told the investigator that she and her husband had disagreed about where the noises came from, the report did not mention the disagreement. Defendant would not learn about the disagreement regarding where the noises came from until Mrs. Crabb testified on March 24, 2003.

In its written order denying defendant's motion for a mistrial, the trial court found no evidence to suggest that the state's investigator acted intentionally in omitting the information. Defendant does not challenge that finding.

Defendant nonetheless argues that the state violated his statutory discovery rights under ORS 135.815 (2001) and his constitutional rights under *Brady v. Maryland,* 373 US 83, 83 S Ct 1194, 10 L Ed 2d 215 (1963). Defendant contends that the evidence was exculpatory, and that the state's failure to disclose it kept defendant from investigating further. Defendant argues that the trial court should have either granted a continuance for defendant to investigate, or struck the testimony, or declared a mistrial.

We conclude that defendant has not shown any discovery violation. The state did not violate statutory discovery requirements, because it provided the written statement that the state's investigator had prepared. *See* ORS 135.815(1)(a) (2001) (requiring state to disclose "relevant written or recorded statements or memoranda of any oral statements" of witness).[15] And the state did not violate *Brady*, because the jury learned at trial of Mr. Crabb's doubts about the location of the noises. *See Kyles v. Whitley,* 514 US 419, 433-34, 115 S Ct 1555, 131 L Ed 2d 490 (1995) (suppression of exculpatory evidence is unconstitutional "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different" (internal

---

[15] ORS 135.815 (2001) provided, in part:

"(1) Except as otherwise provided in ORS 135.855 and 135.873, the district attorney shall disclose to a represented defendant the following material and information within the possession or control of the district attorney:

"(a) The names and addresses of persons whom the district attorney intends to call as witnesses at any stage of the trial, together with their relevant written or recorded statements or memoranda of any oral statements of such persons."

quotation marks and citation omitted)); *Brady*, 373 US at 86-87 (suppression of exculpatory evidence violates due process, because it casts doubt on fairness of trial).[16]

Furthermore, defendant was not prejudiced in any way. In its written order denying defendant's motion for a mistrial, the trial court correctly concluded that the investigator's March 12 memorandum had put defendant on notice that there was an issue regarding the source of the sound and the acoustics of the condominiums. The trial court also concluded, correctly, that defendant had had ample time to investigate the source of the sound; after the state disclosed the investigator's report about the Crabb's testimony, the trial court had granted defendant a continuance from March 13 through March 18 to investigate. Even so, the trial court offered defendant another short continuance when the discrepancy in the Crabbs' testimony first came to light (though defendant apparently did not accept the court's offer). We note that defendant apparently took advantage of the first continuance, because he did offer at trial evidence that the noise might have come from a different source.

We conclude that the trial court permissibly refused to declare a mistrial or to strike the Crabbs' testimony.

### 5. *Whether Hearsay Statements in Sister's Testimony Qualified as Excited Utterances*

■ Defendant challenges the admission of testimony by Mary Jane's sister about defendant's statements to Mary Jane after she discovered e-mails from him to another woman.

Defendant objected to the testimony at trial. The state laid a foundation to introduce the testimony, eliciting from Mary Jane's sister (1) that Mary Jane was very upset

---

[16] Defendant also argues that the state violated Article I, section 11, of the Oregon Constitution, citing *State v. Cartwright*, 336 Or 408, 85 P3d 305 (2004), and *State v. Mai*, 294 Or 269, 656 P2d 315 (1982). Neither case, however, identifies a state constitutional right to criminal discovery. *See Cartwright*, 336 Or at 417-18 (concluding that defendant had statutory right to require third party to make audiotapes available at trial, but expressly noting that that is not pretrial discovery); *Mai*, 294 Or at 274 (noting that statutory right to discovery had been prompted by decision in *Brady v. Maryland*, but not suggesting that Oregon Constitution creates independent discovery right).

and sobbing during the phone call; (2) that Mary Jane had discovered the e-mails and spoken with defendant immediately before she called her sister; (3) that Mary Jane immediately came over to her sister's house, arriving within 20-30 minutes; and (4) that Mary Jane was still visibly shaken and upset when she arrived—so visibly upset, in fact, that a neighbor later asked the sister what was wrong. The trial court ruled that the statements made over the phone were admissible as an excited utterance.

The statements from Mary Jane to her sister were hearsay under OEC 801(3). However, under OEC 803(2), hearsay is admissible if it is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."[17] Defendant argues that Mary Jane's discovery of defendant's e-mails, and defendant's statement that he did not love her, were not "startling" because they did not " 'caus[e] a momentary shock, fright, surprise, or astonishment by a mild or forcible demand upon the attention.' " (Quoting *Webster's Third New Int'l Dictionary* 2228 (unabridged ed 1993).)

We do not agree. The record demonstrates that Mary Jane suffered surprise, astonishment, and shock, and that the events were a forcible demand on her attention. When Mary Jane spoke on the phone she was crying, and she was so distraught that she remained visibly upset when she arrived at her sister's house 20-30 minutes later. The trial court did not err in concluding that the event was startling. *See State v. Carlson*, 311 Or 201, 217, 808 P2d 1002 (1991) (to determine whether event is startling, "the trial judge should 'look primarily to the effect [of the event or condition] upon the declarant' " (alteration in original; citation omitted)); *State v. Cunningham*, 337 Or 528, 542, 99 P3d 271 (2004), *cert den*, 544 US 931 (2005) (phone calls from defendant to victim

---

[17] OEC 803 provides, in part:

"The following are not excluded by [OEC 802, which generally prohibits admitting hearsay testimony], even though the declarant is available as a witness:

"* * * * *

"(2) A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

changing plans for victim to get children were "a subjectively and objectively startling event"; victim's phone calls to others were excited utterances).

Defendant also argues that, even though Mary Jane may have been distraught, "there is no indication that Mary Jane was 'startled' at the time that she made the statement to [her sister]." Again, we disagree. The sister testified that her conversation with Mary Jane took place immediately after Mary Jane's conversation with defendant, and Mary Jane was in tears when she spoke with her sister. Because Mary Jane's statements came on the heels of the startling events, and because Mary Jane showed obvious distress, the trial court did not err when it concluded that Mary Jane was startled at the time she made the statements. *See Carlson,* 311 Or at 218 (statement "must have been made while the excitement persisted," and court considers several criteria, including "lapse of time" (internal quotation marks and citation omitted)); *see also Cunningham,* 337 Or at 544-45 (little time had elapsed between startling event and victim's conversations with others; victim was under stress; and victim had no reason to fabricate statements).

We reject defendant's argument that the trial court erred in allowing the testimony.

B. *Penalty Phase*

■ *Whether Oregon is Constitutionally Required to Create Statewide Standards for Imposing a Death Sentence*

■ Defendant contends, based on *Bush v. Gore,* 531 US 98, 121 S Ct 525, 148 L Ed 2d 388 (2000), that the federal constitution requires Oregon to establish statewide standards regarding who is sentenced to death. Defendant argues that the trial court should have allowed defendant to conduct discovery regarding sentencing decisions for all of Oregon, not just Lincoln County.

This court has rejected the claim that either the state or federal constitution requires the state to establish statewide standards to impose the death penalty. *See State v. Cunningham,* 320 Or 47, 65-68, 880 P2d 431 (1994), *cert den,*

514 US 1005 (1995) (rejecting arguments under Article I, section 20, of Oregon Constitution, and both Eighth and Fourteenth Amendments to United States Constitution). We can find nothing in *Bush* that even remotely calls that conclusion into question. *See* 531 US at 109 (holding on election questions "limited to the present circumstances").

Defendant also argues that he should have been entitled to discover evidence relative to that issue so that he could offer it to the jury. This court rejected that argument, too, in *Cunningham.* 320 Or at 64-69 (so holding in death penalty context). We find no error.

### 2. *Whether the Second and Fourth Death Penalty Questions Must Be Proved Beyond a Reasonable Doubt*

In deciding whether to sentence a defendant to death, a jury must answer four questions. ORS 163.150(1)(b) (1999).[18] Defendant contends that the second and fourth questions unconstitutionally allow a defendant to be sentenced to death on proof less than beyond a reasonable doubt. *See Apprendi v. New Jersey*, 530 US 466, 490, 120 S Ct 2348, 147 L Ed 2d 435 (2000) ("any fact that increases the penalty for a crime beyond the prescribed statutory maximum," other than prior conviction, "must be submitted to a jury, and proved beyond a reasonable doubt").

The second question asks "[w]hether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."

---

[18] Unless otherwise specified, all references to ORS 163.150 are to the 1999 version, effective when the murders took place.

ORS 163.150 (1999) provided, in part:

"(b) Upon the conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

"(A) Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;

"(B) Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

"(C) If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased; and

"(D) Whether the defendant should receive a death sentence."

ORS 163.150(1)(b)(B). In that statute, "probability" means "more likely than not," and the trial court correctly instructed the jury to that effect. *See State v. Wagner*, 305 Or 115, 150-52, 752 P2d 1136 (1988), *vac'd and rem'd on other grounds*, 492 US 914, 109 S Ct 3235, 106 L Ed 2d 583 (1989) (interpreting "probability" in second question to mean "more likely than not"). The jury must find the probability of future violence beyond a reasonable doubt. *See* ORS 163.150(1)(d) (state must prove first three questions beyond reasonable doubt).

As the United States Supreme Court held in *Apprendi* and reiterated in *Blakely v. Washington*, 542 US 296, 124 S Ct 2531, 159 L Ed 2d 403 (2004): " 'Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' " *Blakely*, 542 US at 301 (quoting *Apprendi*, 530 US at 490). The *Apprendi* rule applies generally to aggravating facts that must be found before a defendant is sentenced to death. *See Ring v. Arizona*, 536 US 584, 609, 122 S Ct 2428, 153 L Ed 2d 556 (2002) (*Apprendi* requires that jury, not judge, must determine aggravating circumstances in capital case).

Because the jury must answer the second question "yes" before the death penalty may be imposed, defendant contends that the United States Constitution, as interpreted in *Apprendi/Blakely*, requires the state to prove future dangerousness beyond a reasonable doubt. Defendant contends, however, that proving the probability of a future event beyond a reasonable doubt amounts to proving the future event itself by a lesser standard. He thus concludes that the federal constitution requires the state to prove that a defendant, beyond a reasonable doubt, *would* commit future acts of criminal violence.

We disagree. Defendant misses the important distinction between the fact being proved and the standard by which it is proved. The fact that the state must prove is the *probability* of future dangerousness, not any particular future criminal act. The standard of proof for that probability

is beyond a reasonable doubt. One can see the same distinction in the operation of familiar forms of gambling, such as blackjack. One may not be able to say whether the next card turned by the dealer will be, for example, a face card or a six. But one *can* say, beyond any reasonable doubt, that when enough games are played, the odds will have favored the house and the house will have made money.

We turn to the fourth question, which asks "[w]hether the defendant should receive a death sentence." ORS 163.150(1)(b)(D). The trial court must direct the jury to answer that question "no" if one or more jurors believes a defendant should not receive a death sentence "after considering any aggravating evidence and any mitigating evidence * * *." ORS 163.150(1)(c)(B).[19] ORS 163.150(1)(d) does not provide for a burden of proof on the fourth question, and the trial court instructed the jury to that effect.

As noted, *Apprendi/Blakely* applies only to "facts." *See Blakely*, 542 US at 301 (" 'any *fact* that increases the penalty' " (emphasis added; quoting *Apprendi*, 530 US at 490)); *see also Ring*, 536 US at 609 (Sixth Amendment right to trial by jury applies to "the factfinding necessary to put [a defendant] to death"). But the fourth question does not involve any determination of fact. Instead, in answering the fourth question, the jury weighs aggravating factors against mitigating factors. "[T]he fourth question does not carry a burden of proof, 'because it does not present an issue subject to proof in the traditional sense[;] rather[,] it frames a *discretionary* determination for the jury.' " *Moore*, 324 Or at 432 (emphasis and second alteration in original; quoting *State v. Wagner*, 309 Or 5, 18, 786 P2d 93, *cert den*, 498 US 879, 111 S Ct 212, 112 L Ed 2d 171 (1990)). Because the fourth question does not involve a determination of fact, *Apprendi/Blakely* does not require the state to prove it beyond a reasonable doubt.[20]

---

[19] ORS 163.150(1)(c)(B) (1999) provided:

"The court shall instruct the jury to answer the question in paragraph (b)(D) of this subsection 'no' if, after considering any aggravating evidence and any mitigating evidence concerning any aspect of the defendant's character and background, or any circumstances of the offense and any victim impact evidence as described in subsection (1)(a) of this section, one or more of the jurors believe that the defendant should not receive a death sentence."

[20] The United States Supreme Court has recently reaffirmed that the state need not bear the burden of proving that aggravating factors outweigh mitigating

We therefore conclude that the trial court did not err in ruling that the state need not prove the fourth death penalty question beyond a reasonable doubt.

### 3. Whether Trial Court Should Have Allowed Defendant to Introduce Evidence Regarding Mexican Extradition Law as Mitigating Evidence

Defendant argues that the trial court erred during the penalty phase, because it prevented him from offering certain mitigating evidence relating to his capture and return from Mexico.

At the penalty phase, the jury may consider mitigating evidence that relates to defendant's background, or to defendant's character, or to the circumstances of the offense. ORS 163.150(1)(c)(B) (for fourth question, jury may consider "any mitigating evidence concerning any aspect of the defendant's character or background, or any circumstances of the offense"); *State v. Stevens*, 319 Or 573, 580-83, 879 P2d 162 (1994) (interpreting statute and United States Supreme Court cases); *see Oregon v. Guzek*, ___ US ___ , 126 S Ct 1226, 1231-32, 163 L Ed 2d 1112 (2006) (although Eighth Amendment requires states to allow introduction of mitigating evidence regarding "the defendant's character or record or the circumstances of the offense" (internal quotation marks and citation omitted), states otherwise retain "authority to set reasonable limits upon the evidence a defendant can submit").

Defendant argues that the trial court excluded mitigating evidence that related to his character. He asserts:

"That evidence [relating to defendant's arrest and extradition] tended to prove that defendant did not resist his arrest by the Mexican authorities, try to escape, or use or threaten to use violence. It tended to prove that he did not lie to the authorities regarding his crimes in Oregon. It tended to prove that defendant had not planned his escape to Mexico; if he had, he would have been more likely to familiarize himself with Mexican law as it applied to him. Finally, it

factors. *Kansas v. Marsh*, ___ US ___ , 126 S Ct 2516, 165 L Ed 2d 429 (2006) (upholding Kansas statute that required death penalty if jury concluded that aggravating and mitigating factors were in equipoise). However, *Marsh* did not directly address *Apprendi* or its progeny.

tended to prove that he voluntarily agreed to waive extradition from Mexico, submitting to his trial in Oregon. The jury could have relied on any of those facts to determine that positive aspects of defendant's character justified a sentence less than death."

Defendant's argument, however, bears little relationship to what actually happened at trial. Both defendant and Agent Clegg testified extensively before the jury about the circumstances of defendant's arrest in Mexico.[21] Defendant specifically identifies only one piece of evidence that the trial court excluded, and that was evidence that Mexican extradition law prohibits extraditing a fugitive unless the receiving state waives the death penalty.[22] The court did not otherwise keep defendant from offering evidence about the facts surrounding his arrest. Because the evidence that defendant claims should have been introduced actually was introduced, we see no merit to that part of defendant's argument.

We turn, then, to the only question presented by this record: Whether evidence about Mexican extradition law relates to defendant's character.

To answer that question, we must first discuss briefly what constitutes evidence relating to a defendant's character. This court has noted that "character" is "read quite broadly" in this context. *Stevens,* 319 Or at 583. It is "not necessarily * * * linked to a defendant's culpability for the crime for which he or she is being sentenced." *Id.* Character evidence includes evidence of " 'a defendant's disposition to make a well-behaved and peaceful adjustment to life in prison.' " *Id.* (quoting *Skipper v. South Carolina,* 476 US 1, 7, 106 S Ct 1669, 90 L Ed 2d 1 (1986)). In *Stevens,* this court held that character evidence also included evidence that

---

[21] Although that testimony was introduced during the guilt phase, the trial court instructed the jury to consider all guilt phase evidence during the penalty phase. *See* ORS 163.150(1)(a) (neither state nor defendant may introduce "repetitive evidence that has previously been offered and received" during guilt phase; court will instruct the jury to consider all evidence at sentencing).

[22] The trial court had granted the state's motion *in limine* to exclude "[e]vidence concerning the *extradition and deportation law of Mexico* with regard to American fugitives." (Emphasis added.)

defendant's execution would have harmed defendant's daughter.

> "A rational juror could infer from the witness's testimony that she believed her daughter would be adversely affected by defendant's execution because of something positive about his relationship with his daughter and because of something positive about defendant's character or background. Put differently, a rational juror could infer that there are positive aspects about defendant's relationship with his daughter that demonstrate that defendant has the capacity to be of emotional value to others."

*Id.* at 584.

The evidence need not relate directly to defendant's character; it may be circumstantial evidence. *See id.* ("While the witness's testimony may not offer any direct evidence about defendant's character or background, it does offer circumstantial evidence.").

Here, defendant argues that Mexican extradition law would have "tended to prove that defendant had not planned his escape to Mexico; if he had, he would have been more likely to familiarize himself with Mexican law as it applied to him." That defendant did not premeditate his crimes, he contends, illuminates a positive aspect of his character.

As defendant implicitly recognizes, the particularities of Mexican extradition law do not relate *directly* to any aspect of defendant's character. For Mexican extradition law to be relevant at all, it must be circumstantial evidence from which a juror could rationally infer something about defendant's character. *See Stevens,* 319 Or at 584 (concluding that testimony was circumstantial evidence of character). Mexican extradition law, then, must make some aspect of defendant's character "more probable or less probable." OEC 401 (relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable").

Although defendant does little to elaborate on his argument, it seems to proceed as follows. Defendant offered testimony to suggest that Mexican extradition law prohibits

Mexico from extraditing fugitives who might face the death penalty. Mexico would, instead, extradite a fugitive only if the state agreed to waive the death penalty. From that evidence, defendant draws the following chain of inferences: Mexican extradition law would have benefitted defendant, so defendant had an incentive to learn about Mexican law. Defendant did not take advantage of Mexican law—he did not insist on formal extradition—so defendant must not have known about Mexican law. Because defendant had an incentive to learn about Mexican law, but he did not do so, the mere existence of the law suggests that defendant did not plan the murders.

In our view, the last inference does not follow. Defendant's failure to research Mexican law *before* the murders proves nothing, because defendant failed to research Mexican law *after* the murders, either. He had at least as much incentive to research it afterwards, and he had nine days to do it in. But defendant never researched Mexican law at any point.

In short, evidence about the nature of Mexican law is not relevant to defendant's character, because it did not make it less likely that he planned the murders. *See* OEC 401 (relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable"); *Trook v. Sagert*, 171 Or 680, 690, 138 P2d 900 (1943) ("If a rational relationship does not exist between the item of evidence offered and the fact which a party must prove, it would be a waste of time to let the witness testify."). The trial court properly rejected it.

## III. CONCLUSION

As previously noted, we have considered defendant's other assignments of error. As to those assignments of error, we conclude that they either are unpreserved, are disposed of by prior rulings of this court, or are without merit. In our view, further discussion of those assignments would not benefit the bench, bar, or public.

The judgment of conviction and the sentence of death are affirmed.